No. 103,918

STATE OF KANSAS, *Appellee*, v. MICHAEL RANDOLPH, *Appellant*.

(301 P.3d 300)

filed May 10, 2013.

*Sarah Ellen Johnson*, of Capital Appellate Defender Office, argued the cause, and *Rebecca E. Woodman*, of the same office, was on the brief for appellant.

*Christopher L. Schneider*, assistant district attorney, argued the cause, and *Jerome A. Gorman*, district attorney, and *Derek Schmidt*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

LUCKERT, J.: A jury convicted Michael Randolph of one count of rape of a child under the age of 14, in violation of K.S.A. 21-3502(a)(2). Randolph appeals his conviction, raising three issues. First, he makes an argument this court has recently rejected—that the definition of "sexual intercourse," which is an element of the crime of rape, states alternative means, each of which must be supported by sufficient evidence. Second, he argues the trial court erred in admitting his statement to law enforcement officers after finding the statement was voluntarily made. We reject this argument, concluding there was substantial competent evidence to support the trial court's findings. We hold the statement was the product of Randolph's free and independent will. Third, Randolph argues the trial court erred in the admission of certain evidence.

But he failed to object to the admission of the evidence at trial and, thus, failed to preserve this issue for consideration on appeal. Because we reject or do not consider Randolph's attacks on his conviction, we affirm his rape conviction.

Randolph also appeals from his sentence, again raising several arguments. He correctly argues that the sentencing judge abused his discretion by applying the wrong statute and, therefore, the wrong legal standard when denying Randolph's motion for departure from the statutory sentence. Because we do not find this error harmless, we vacate Randolph's sentence and remand for resentencing without reaching all of Randolph's other sentencing arguments.

## Facts and Procedural Background

Randolph's conviction stems from an incident at the apartment of his sisters, who were babysitting 6-year-old Z.T. and her brother, 7-year-old K.H., on December 3, 2008. That night, the children slept next to each other on pallets on the living room floor, and Randolph slept nearby.

The next morning when Z.T. and K.H. were picked up by their mother, K.H. told his mother he saw Randolph pull off Z.T.'s pants and lie on top of her. Z.T. then told her mother that she woke up and found that Randolph had "pulled off her panties and had his face between her legs."

Z.T.'s mother took Z.T. to a hospital for a sexual assault examination, and law enforcement officers arrived shortly thereafter. Z.T. told an officer that a man licked her vagina and climbed on top of her. The officer referred Z.T. to Sunflower House, a center that conducts forensic interviews of children who have allegedly been sexually abused. Z.T. told a Sunflower House interviewer that Randolph touched her " 'cookie,' " which she identified as the vaginal area on a female anatomical diagram, with his hands and his ' "stuff," ' which she identified as the penis on a male anatomical diagram. She also said he touched her "cookie" on the "inside" and that Randolph put his "stuff" inside her "cookie." When asked how she knew Randolph did this, she said she "was feeling it." Z.T. said

when one of Randolph's sisters turned on the light and came down the hallway, Randolph acted like he was asleep.

In a separate Sunflower House interview, K.H. said he saw Randolph pull down his sister's pants and get on top of her. He did not see what happened to Z.T.'s panties and Randolph's clothing was on. K.H. said he woke up because Randolph was making a "thumping noise." This happened for about "1 minute." When asked why Randolph stopped, K.H. said one of Randolph's sisters turned on the hallway light, so Randolph got off of Z.T. and pretended to be asleep. When Randolph's sister turned off the light and went back to her bedroom, Randolph started "playing with himself" by putting his hands inside the front of his pants; then Randolph went back to sleep. According to K.H., his sister subsequently told him that Randolph had gotten on top of her, but K.H. said he already knew that because he had seen it.

Following these interviews, Kansas City, Kansas, Police Detective Ken Cantwell contacted Randolph, who voluntarily went to the police station. Once there, Randolph read aloud, initialed, and signed a form setting out his *Miranda* rights and agreed to a waiver of those rights. See *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, *reh. denied* 385 U.S. 890 (1966). Randolph was interrogated in two segments. The first segment lasted 1 hour and 15 minutes and was not recorded; the second segment lasted about 15 minutes and was audio-recorded. At first, Randolph consistently denied that anything happened. Eventually, however, he confessed to touching Z.T.'s vagina with his fingers and said his fingers penetrated her vagina "slightly" or a "quarter of an inch." Randolph said the only reason he stopped was because K.H. woke up and was looking at him. During the trial, Cantwell testified regarding his questioning of Randolph, and Randolph's recorded statement was played for the jury. The recording included Randolph's confession that he digitally penetrated Z.T.'s vagina.

Both children testified at trial. Z.T.'s trial testimony was ambiguous and somewhat inconsistent with her Sunflower House interview. Nevertheless, she testified that Randolph took off his pants and touched her "private part" with his "private part" on the "inside of my body." When asked how she knew Randolph touched

her with his private part, Z.T. answered, "I don't know, because my brother must have told me. He was laying [*sic*] right by me." When asked if she could feel it when Randolph touched her private part, Z.T. said, "No." But on cross-examination, Z.T. testified that her brother did not tell her anything. K.H. testified that at some point during the night, he woke up and saw Randolph get on top of his sister and touch her with his "private."

Randolph testified in his own defense and recanted his confession. No physical evidence—such as DNA testing—was admitted that tied Randolph to the crime.

The jury found Randolph guilty of rape of a child under 14 years of age, in violation of K.S.A. 21-3502(a)(2). Before sentencing, Randolph filed a motion for departure from Jessica's Law, which provides that a first-time offender who is 18 years or older and convicted of rape as defined in K.S.A. 21-3502(a)(2) (sexual intercourse with a child under the age of 14) must be sentenced to a lifetime sentence with a mandatory minimum of not less than 25 years "unless the judge finds substantial and compelling reasons, following a review of mitigating circumstances, to impose a departure." See K.S.A. 21-4643(a)(1), (d). The sentencing judge, after referring to the mitigating factors in K.S.A. 21-4716(c)(1), the general departure statute under the Kansas Sentencing Guidelines Act, rather than the departure factors that are unique to Jessica's Law, found there were no substantial and compelling reasons for a departure in this case. In imposing the lifetime sentence with the mandatory minimum of 25 years, the judge also indicated that if Randolph were to be "granted some kind of parole, [Randolph] will be on lifetime supervision as parole or post-release applies." The journal entry of sentencing reflects that the court imposed lifetime postrelease supervision.

Randolph now timely appeals. This court has jurisdiction under K.S.A. 22-3601(b)(1) (maximum sentence of life imprisonment imposed; off-grid conviction under K.S.A. 21-4643 of hard 25 sentence).

JURY WAS NOT INSTRUCTED ON ALTERNATIVE MEANS

Randolph first challenges his conviction of rape, claiming he was

denied his statutory right to a unanimous verdict because the jury instruction presented alternative means of committing the crime and the State failed to present sufficient evidence of each means. See *State v. Wright*, 290 Kan. 194, 206, 224 P.3d 1159 (2010); *State v. Timley*, 255 Kan. 286, 289-90, 875 P.2d 242 (1994). More specifically, Randolph argues that rape of a child under the age of 14 under K.S.A. 21-3502(a)(2) is an alternative means crime because an essential element of the crime—"sexual intercourse"—is defined in a manner that creates three distinct ways of committing rape, providing it is "any penetration of the female sex organ by a finger, the male sex organ or any object." See K.S.A. 21-3501(1). Thus, according to Randolph, the State was required to prove he committed each "means" of penetration upon which the jury was instructed. In this case, the jury instruction included only two of the options—penetration "by a finger or by the male sex organ." Randolph acknowledges that the State presented at least some evidence to support the claim that he penetrated Z.T.'s vagina with his finger. But he claims the State failed to present sufficient evidence that he penetrated Z.T.'s vagina with his penis.

In several recent cases, we have held that K.S.A. 21-3502 does not create an alternative means crime by incorporating the statutory definition of sexual intercourse from K.S.A. 21-3501(1), as penetration of the female sex organ "by a finger, the male sex organ or any object." Instead, K.S.A. 21-3501(1) merely defines "sexual intercourse" and describes different factual circumstances by which a defendant might perpetrate the single *actus reus* of the crime—"penetration of the female sex organ." Consequently, the jury instruction reiterating two of these options did not include alternative means of committing the charge of rape. See *State v. Newcomb*, 296 Kan. 1012, Syl. ¶ 1, 298 P.3d 285 (2013); *State v. Swindler*, 296 Kan. 670, Syl. ¶ 2, 294 P.3d 308 (2013); *State v. Britt*, 295 Kan. 1018, 1027, 287 P.3d 905 (2012).

Because Randolph concedes the State presented sufficient evidence to establish one count of rape by digital penetration, there was sufficient evidence to support his conviction and he was not denied his right to a unanimous verdict.

## CONFESSION WAS VOLUNTARY

Randolph next contends that the trial court erred in admitting into evidence the audio-recording of his confession to Detective Cantwell. In making this argument, Randolph suggests that his own intellect, Cantwell's interview techniques, and the lack of "fairness" in Cantwell's interrogation rendered his confession involuntary.

*Standards to Be Applied by Trial Court and Standard of Review*

When a defendant challenges his or her statement to a law enforcement officer as involuntary, the prosecution must prove the voluntariness of the statement by a preponderance of the evidence. In determining whether the statement was the product of an accused's free and independent will, a trial court looks at the totality of the circumstances surrounding the statement and determines its voluntariness by considering the following nonexclusive list of factors:

" ' "(1) the accused's mental condition; (2) the manner and duration of the interrogation; (3) the ability of the accused to communicate on request with the outside world; (4) the accused's age, intellect, and background; (5) the fairness of the officers in conducting the interrogation; and (6) the accused's fluency with the English language." [Citation omitted.]' " *State v. Stone*, 291 Kan. 13, 21, 237 P.3d 1229 (2010) (quoting *State v. Johnson*, 286 Kan. 824, 836, 190 P.3d 207 [2008]).

In *State v. Sharp*, 289 Kan. 72, 81, 210 P.3d 590 (2009), this court described the weight a court should give the six factors, stating:

" '[T]hese factors are not to be weighed against one another . . . , with those favorable to a free and voluntary confession offsetting those tending to the contrary. Instead, the situation surrounding the giving of a confession may dissipate the import of an individual factor that might otherwise have a coercive effect. [Citation omitted.] Even after analyzing such dilution, if any, a single factor or a combination of factors considered together may inevitably lead to a conclusion that under the totality of circumstances a suspect's will was overborne and the confession was not therefore a free and voluntary act.' [Citations omitted.]"

On appeal of a trial court's determination regarding the voluntariness of a confession, an appellate court applies a dual standard when reviewing the trial court's decision on a suppression question. First, the factual underpinnings of the decision are reviewed under

a substantial competent evidence standard. Next, the appellate court reviews the trial court's legal conclusion drawn from those facts de novo. The appellate court does not reweigh evidence, assess the credibility of the witnesses, or resolve conflicting evidence. *State v. Gilliland*, 294 Kan. 519, 527, 276 P.3d 165 (2012), *cert. denied* 133 S. Ct. 1274 (2013); *State v. Robinson*, 293 Kan. 1002, 1017, 270 P.3d 1183 (2012); *Stone*, 291 Kan. at 21.

*Trial Court Hearing and Ruling*

In this case, after the State filed a motion to admit Randolph's statements made during the custodial interrogation, the trial court held an evidentiary hearing, see *Jackson v. Denno*, 378 U.S. 368, 84 S. Ct. 1774, 12 L. Ed. 2d 908 (1964), at which Randolph challenged the voluntariness of those statements. See *State v. Bogguess*, 293 Kan. 743, 751, 268 P.3d 481 (2012) (at a *Jackson v. Denno* hearing, the issue before the court is whether defendant's statement or confession was voluntary; truthfulness of statement not at issue). Cantwell testified at that hearing about what happened during both the unrecorded portion of the interrogation and the recorded portion. Although the trial court mentioned that Randolph was free to testify as well, the transcript of the hearing reflects that Randolph made no request to do so. *Cf. Bogguess*, 293 Kan. at 751 (at a *Jackson v. Denno* hearing, defendant may take the stand for the limited purpose of testifying about events related to whether the defendant's statement was voluntarily made). After considering Cantwell's testimony, the advice of rights form initialed and signed by Randolph, a transcribed copy of Randolph's statement, and counsel's arguments, the trial court made findings on the record on each of the six voluntariness factors set out above and concluded Randolph's confession was voluntary.

*Randolph's Arguments and Authorities*

In asking this court to consider the totality of the circumstances, Randolph focuses only on three of those factors: Randolph's intellect; the manner of the interrogation, *i.e.*, Cantwell's interview techniques; and the fairness, or lack thereof, in the interrogation. He argues there was not substantial competent evidence to support the trial court's findings related to these factors. In making these

arguments, Randolph relies on two cases—*State v. Swanigan*, 279 Kan. 18, 106 P.3d 39 (2005), and *Stone*, 291 Kan. at 13, 21. In both of these cases, this court held confessions were involuntary because a combination of circumstances tainted the interrogations. Those circumstances are distinguishable from the facts of this case.

In *Swanigan*, the defendant was accused of robbing a convenience store. Before entering, the robber had put his hand to the window and looked into the store. Swanigan was picked up several days after the robbery and interrogated. During the interrogation, the officers repeatedly told Swanigan that his fingerprints had been found on the window, even though they had not been. After reviewing the audio-recorded interrogation, this court found "no express threats were uttered, but . . . evidence of implied threats exist[ed] on the audiotape" and the implied threats were intertwined with the officers' urgings that Swanigan cooperate. *Swanigan*, 279 Kan. at 26. The officers told Swanigan that he needed to " 'come clean' " in order to establish that he had not taken part in a number of other crimes: " 'We just want to know your involvement in yours. That's all we want to know from you, so that you don't get charged with all of them. 'Cause I honestly don't think you're involved in all of them.' " *Swanigan*, 279 Kan. at 26.

Applying the totality of the circumstances test in *Swanigan*, this court found the defendant's confession involuntary. The specific factors the court relied on in reaching this conclusion included: (1) the law enforcement officers' repeated use of false information and evidence, including the presence of Swanigan's fingerprints on the store window; (2) the combination of the tactics used by law enforcement, including threats to convey Swanigan's lack of cooperation to the county attorney and to charge him with additional robberies unless he confessed, threats that were inconsistent with the exercise of the *Miranda* right to remain silent; and (3) evidence of the defendant's low intellect and his susceptibility to anxiety. *Swanigan*, 279 Kan. at 32-39. But the *Swanigan* court expressly noted that "any one of these factors," when considered alone, might not be sufficient to show coercion. Rather, the combination of all of these factors led the court to find the statement involuntary. *Swanigan*, 279 Kan. at 39.

More recently, in *Stone*, the second case relied on by Randolph, this court reaffirmed *Swanigan*'s strong admonition to consider the totality of circumstances in determining the voluntariness of a confession. In *Stone*, as in *Swanigan*, this court reversed the trial court's denial of a motion to suppress statements made by the defendant in a custodial interview based upon the totality of the circumstances, including: (1) the defendant's apparent exhaustion that was obvious during the interrogation, which began at 1 a.m., because of the defendant's garbled and disorganized responses to questions; (2) the detective made misleading and ultimately untrue statements indicating semen had been found on the pajamas of the 9-year-old victim; (3) the detective implied that if the defendant told the truth, which the detective repeatedly insisted was the version told by the victim, the length of his sentence could be affected; and (4) the detective said the defendant would be viewed as a sexual predator unless he confessed. See *Stone*, 291 Kan. at 15, 22-33. The consequence, this court concluded, was that Stone's free will had been overcome, as reflected by "a close examination of the interrogation[, which] reveals that Stone did not volunteer facts but rather he adopted facts as they were suggested to him by the detective and as her insistence that he tell 'the truth' became more adamant." *Stone*, 291 Kan. at 29.

Randolph urges this court to conclude that his case is particularly similar to *Stone* in that Cantwell used deceptive techniques by suggesting there was DNA evidence, feeding details of the crime to Randolph, and offering the possibility of an alcohol-induced blackout as an explanation for why Randolph might not remember those details. Randolph implies that these factors were compounded by his low intellect. These arguments are not persuasive, however, because Randolph's case is distinguishable from both *Swanigan* and *Stone* in that there is substantial competent evidence to support the trial court's findings, which in turn leads to the conclusion that Randolph's free will was not overcome.

*Randolph's Intellect Adequate to Make Knowing and Voluntary Statement*

With regard to Randolph's intellect, the trial court found that "[a]ll indications from the defendant in the statement are that his mental condition was not abnormal." The court also noted that Randolph's intellect was adequate as "demonstrated by inference from the coherence of his statement and the responses to questions that the detective" asked him. Further, the trial court found that Randolph's intellect was "adequate . . . to appreciate things like voluntariness and coercion."

It is this last finding that is the focus of Randolph's argument. He points to Cantwell's testimony at the *Jackson v. Denno* hearing indicating that Randolph had trouble reading the word "coercion" when Cantwell asked Randolph to read the advice of rights and consent form. Cantwell testified that other than this one word, Randolph had no trouble reading the form. Even so, Randolph suggests we should equate his difficulty with reading the word coercion to a significant deficiency in his intelligence.

Even if we accept the lack of understanding of the word coercion as evidence of a low intelligence, it is well established that low intelligence alone does not preclude a finding that an accused knowingly and voluntarily waived his or her *Miranda* rights. See *Johnson*, 286 Kan. at 837 (defendant's low intelligence did not preclude a finding that he knowingly and voluntarily waived his *Miranda* rights); *State v. Thompson*, 221 Kan. 165, 169, 558 P.2d 1079 (1976) (even with defendant's IQ of 68, his confession was freely, voluntarily, and intelligently given); see also *Colorado v. Connelly*, 479 U.S. 157, 163-65, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986) (low intellect not basis for finding statement involuntary if no coercion); *State v. Mays*, 277 Kan. 359, 374-76, 85 P.3d 1208 (2004) (verbal IQ of 77 was only one factor); *State v. Lane*, 262 Kan. 373, 386, 940 P.2d 422 (1997) (IQ of 77 was only one factor).

More significantly, there is no indication Randolph had any trouble understanding the word "coercion" once it was pronounced and its meaning was explained. Rather, Cantwell's testimony at the *Jackson v. Denno* hearing and Randolph's own demeanor and con-

duct during the recorded portion of the interview provide substantial competent evidence to support the trial court's findings that Randolph's intellect was adequate and his mental condition was not abnormal. Unlike the situations in *Swanigan* and *Stone*, there is no evidence that Randolph's intelligence or his general mental condition interfered with his ability to understand his rights or to voluntarily and knowingly waive those rights, to understand Cantwell's questions, or to understand the incriminating nature of his own statements.

*Interview Techniques and Fairness of Interrogation*

As for the two other factors—Cantwell's interrogation techniques and the fairness of the interrogation, Randolph argues he maintained his innocence and only admitted to details of the crime after Cantwell had mentioned them and coerced him to falsely confess.

In supporting this argument, Randolph first argues the record is insufficient to support the trial court's conclusions because Cantwell provided only "scant" details regarding what occurred during the unrecorded portion of the interrogation. Randolph emphasizes that "[w]hether the 15-minute recorded statement . . . was voluntary or involuntary was squarely dependent on what happened during the 1-hour-15-minute interrogation that preceded it." He argues a recording of the entire interview would be more reliable evidence than the conflicting testimony of Randolph and Cantwell regarding what was said during the interview and "the formal recorded confession, and the unrecorded interrogation that preceded it, are so inextricably intertwined that the voluntariness of the first cannot be determined without knowing precise details of the second."

Certainly, a recording would be more accurate than most human's memories. And the State, by not recording the entire interview, has unnecessarily raised a negative inference that it has something to hide. It also risks a ruling that the recording is not admissible because it does not accurately reflect the entire interview. Consequently, the better practice and the one we advise is for law enforcement officers to record the entire interview with a

suspect when they are planning to record parts of the interview and recording equipment is available.

Nevertheless, Randolph does not cite any authority for his argument that a trial court does not have a sufficient basis for making findings following a *Jackson v. Denno* hearing if a portion of an interrogation is not recorded. Certainly, the lack of a recording does not make this case unique from numerous cases considered by this and other courts. Nor is there anything unique about the specific facts of this case. The State presented the trial court with Cantwell's testimony regarding both portions of the interrogation, and Randolph had the opportunity to cross-examine Cantwell. The evidence submitted was sufficient to overcome the negative inference the State unnecessarily created and to meet the State's burden of proof. In addition, Randolph's trial testimony mitigates any suggestion he was coerced into a false confession by Cantwell's suggestions. We reach this conclusion for at least two reasons.

First, unlike the situation in *Stone*, where the confession mirrored the details suggested by the law enforcement officers, there is substantial competent evidence of the trial court's factual finding that the fairness of the interview is "born[e] out by the contents of the suspect's statement," which did not regurgitate the version of events suggested by Cantwell or latch on to Cantwell's suggestion that Randolph did not remember details because of an alcohol-induced blackout. Instead, Randolph offered his own version of events and did so in some detail. According to Cantwell, he only reported Z.T.'s version of what happened, which was that Randolph had licked her vagina and put his "stuff" in her "cookie." Randolph stated, however, that he licked his fingers and then touched Z.T.'s vagina, penetrating her slightly. He provided details, indicating the extent of the digital penetration—a "quarter of an inch"—and that he stopped because K.H. was looking at him. Randolph did not testify that Cantwell ever suggested events similar to Randolph's confession of licking his fingers and digitally penetrating Z.T.'s vagina. In fact, when asked on cross-examination, "Why would you use such a specific detail as a quarter of an inch inside her vagina?," Randolph replied, "I'm not for sure at the time." Because Randolph provided his own version of events, there is

substantial competent evidence that Randolph exercised independent judgment in making his statement and was not unduly coerced into admitting to a crime detailed by Cantwell.

Second, Randolph's own testimony indicates he was not misled by Cantwell's suggestions. Substantial competent evidence of this can be found in Randolph's testimony regarding his concern about potential DNA evidence linking him to the crime. Cantwell testified at the *Jackson v. Denno* hearing that he discussed possible DNA evidence with Randolph during the interrogation. He indicated, "I may have implied the fact that the little girl had mentioned about him licking her vagina and that there is DNA in saliva, and we did do a rape kit where we could collect that." Apparently, the potential that DNA evidence would link Randolph to the crime was a substantial factor motivating Randolph to make a statement to Cantwell because when Randolph's attorney asked Randolph why he confessed when he did not commit the crime, Randolph testified it was because the investigators had the DNA from the victim and believed the children. But Randolph also indicated he understood his DNA had not yet been tested. For example, at one point he testified:

"Based on taking my DNA sample when I first got there, I assumed, of course, he was going to mention some kind of DNA. And I didn't know if he did or not. This is just what he said. He didn't say he had any DNA personally, he just said we took DNA from the victim."

Despite his apparent knowledge that Cantwell did not have DNA evidence at the time of the interview that linked Randolph to the crime, on appeal Randolph asserts he confessed to the details of the crime because he thought he was required to "explain away false DNA evidence of his saliva."

Yet, there is no evidence of a false statement by Cantwell; at most, Cantwell made it clear they would be testing DNA samples from the victim and her underwear and comparing that to Randolph's DNA. Even if we consider Cantwell's statements—or the implication of them—to have been knowingly false, this court has repeatedly declined to find it to be an inherently impermissible interrogation technique for a law enforcement officer to make a

false claim that there was evidence implicating a suspect in a crime. *State v. Harris*, 279 Kan. 163, 170, 105 P.3d 1258 (2005); see *Frazier v. Cupp*, 394 U.S. 731, 739, 89 S. Ct. 1420, 22 L. Ed. 2d 684 (1969) (the fact that officers misrepresented statements made by defendant's companion was insufficient to render the defendant's confession inadmissible); *State v. Harris*, 293 Kan. 798, 811, 269 P.3d 820 (2012) (confession may be voluntary even when officers lie to defendant during an interview); *State v. Wakefield*, 267 Kan. 116, 126-28, 977 P.2d 941 (1999) (deceptive interrogation techniques do not establish coercion but are one circumstance that must be viewed in conjunction with the others present to assess totality of the circumstances).

It is only where, such as in *Swanigan* and *Stone*, there was a combination of factors that overcame an accused's free will that we have found a defendant's statement to be involuntary. See, *e.g.*, *State v. Garcia*, No. 104,998 (filed April 26, 2013) (holding confession was involuntary where medical treatment for gunshot wound was withheld and law enforcement officer allowed suspect's girlfriend to relay officer's promise of leniency—"they are not going to book you for murder"—without correction by officer). In this case, the record provides substantial competent evidence to support the trial court's conclusion that Randolph was not misled and his free will was not overcome. And our de novo review of the trial court's legal conclusions leads us to hold that Randolph's statement was voluntary. Based upon the totality of circumstances, we conclude the trial court did not err in admitting Randolph's statements.

### RANDOLPH FAILED TO PRESERVE OBJECTION TO DNA TESTIMONY

Next, Randolph contends the trial court erred in admitting the testimony of several witnesses who explained they could not draw a conclusion about whether there had been a sex crime committed just because testing did not reveal semen or the DNA of anyone other than Z.T. In this testimony, for example, a witness explained that "DNA actually goes away really quickly on the body" of a prepubescent child and that "saliva often degrades really quickly."

We do not reach the merits of Randolph's arguments, however, because the arguments were not preserved for appeal.

This is because, as Randolph admits in his appellate brief, he did not object to the admission of this evidence at trial. K.S.A. 60-404 dictates that "evidentiary errors shall not be reviewed on appeal unless a party has lodged a timely and specific objection to the alleged error at trial." *State v. King*, 288 Kan. 333, 349, 204 P.3d 585 (2009); see *State v. McCaslin*, 291 Kan. 697, 706-07, 245 P.3d 1030 (2011). Randolph argues this court should still consider this issue because doing so is necessary to serve the ends of justice or to prevent a denial of fundamental rights. See *State v. Dukes*, 290 Kan. 485, 488, 231 P.3d 558 (2010) (stating exceptions to general rule that an issue will not be considered for the first time on appeal).

This court has held, however, that if an appellate court was to overlook the lack of an objection "because it is necessary to serve the ends of justice or to prevent the denial of [a defendant's] right to a fair trial, these and other caselaw exceptions would soon swallow the general statutory rule" of K.S.A. 60-404. *State v. Richmond*, 289 Kan. 419, 429-30, 212 P.3d 165 (2009); see *Harris*, 293 Kan. at 813 (noting that this court has disapproved of any past loosening of K.S.A. 60-404 requirement of specific and timely objections); see also *King*, 288 Kan. at 348 ("[T]he legislature's intent in enacting K.S.A. 60-404 is clear: a party must lodge a timely and specific objection to the admission or exclusion of evidence in order to preserve the evidentiary question for review.").

Consequently, we hold that Randolph's challenge to the testimony regarding the absence of DNA evidence was not preserved for appeal.

### SENTENCING ERROR

While we affirm Randolph's conviction, we find two of his sentencing issues meritorious and, as a result, we vacate his sentence and remand for further sentencing proceedings. The error that leads us to vacate the entire sentence in this case arises from the sentencing judge's ruling on Randolph's motion for departure to a Kansas Sentencing Guidelines sentence under K.S.A. 21-4643(d).

As previously noted, K.S.A. 21-4643, commonly referred to as Jessica's Law, provides that a first-time offender convicted of rape in violation of K.S.A. 21-3502(a)(2) must be sentenced to life imprisonment with a minimum term of not less than 25 years "unless the judge finds substantial and compelling reasons, following a review of mitigating circumstances, to impose a departure." See K.S.A. 21-4643(a)(1), (d). K.S.A. 21-4643(d) provides a nonexclusive list of mitigating circumstances a sentencing court may consider when deciding whether to depart from the statutorily prescribed sentence.

In denying Randolph's departure motion, the sentencing judge found that there were not substantial and compelling mitigating factors to depart. Typically, such a determination is reviewed on appeal under an abuse of discretion standard. *State v. Spencer*, 291 Kan. 796, 807, 248 P.3d 256 (2011). A sentencing judge abuses his or her discretion if the judicial action

"(1) is arbitrary, fanciful, or unreasonable, *i.e.*, if no reasonable person would have taken the view adopted by the trial court; (2) is based on an error of law, *i.e.*, if the discretion is guided by an erroneous legal conclusion; or (3) is based on an error of fact, *i.e.*, if substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based." *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012) (citing *State v. Gonzalez*, 290 Kan. 747, 755-56, 234 P.3d 1 [2010]).

Randolph argues the sentencing judge was guided by an erroneous legal conclusion because he relied on the wrong statutory factors in ruling on the departure motion. Indeed, the sentencing judge mistakenly referenced the nonexclusive list of mitigating factors found in K.S.A. 21-4716(c)(1) (presumptive sentencing guidelines sentence; downward departure), which is a part of the general departure statute under the Kansas Sentencing Guidelines Act, rather than the more specific Jessica's Law's nonexclusive list of mitigating factors found in K.S.A. 21-4643(d). Neither counsel brought this mistake to the judge's attention during the sentencing hearing. Looking to the wrong list of factors, the sentencing judge concluded, "Our legislature has itemized in K.S.A. 21-4716 certain mitigating factors that could be taken into consideration. Certainly

the list is not exclusive. But we don't have really any of those mitigating factors here."

In contrast, there are at least two factors that are not found in K.S.A. 21-4716 but are in the Jessica's Law departure factors of K.S.A. 21-4643(d) that are implicated by the facts of this case—Randolph did not have a significant history of prior criminal activity (K.S.A. 21-4643[d][1]) and Randolph was just 22 years of age (K.S.A. 21-4643[d][6]). Randolph's written motion mentioned his lack of criminal history as one factor for departure, and Randolph's counsel mentioned Randolph's age of 22 at the sentencing hearing. Yet, the sentencing judge did not recognize the lack of significant criminal history or the defendant's age as statutory factors.

The State argues, however, that the sentencing judge considered the factors presented by Randolph. Arguably, on this basis we could find the sentencing judge's use of the wrong legal standard harmless because he considered some mitigating factors and Jessica's Law does not require a court to state the reasons why it denied a departure motion; the statute only requires the court to state on the record the substantial and compelling reasons for why a departure motion was granted, not denied. See K.S.A. 21-4643(d); *State v. Baptist*, 294 Kan. 728, 733-35, 280 P.3d 210 (2012). Finally, there are similar cases where this court has affirmed the denial of a departure and a reasonable person could agree with the sentencing judge.

Nevertheless, there is a reasonable probability that a sentencing judge reviewing the correct statutory list would have given more weight to the departure factors if the judge had recognized the factors as ones itemized by the legislature for consideration. Further, when these factors were added to the nonstatutory considerations argued by Randolph—the incident was a one-time event with no evidence of long-term trauma to the victim, Randolph had been drinking and could seek treatment, Randolph's cooperation with law enforcement officers, and the lack of evidence that Randolph posed a danger to society—there is a reasonable probability that use of the correct legal standards could affect the outcome of the departure motion. Consequently, we cannot say the error was harmless. See K.S.A. 60-261 (statutory harmless error standard);

K.S.A. 60-2105 (same); *Ward*, 292 Kan. at 570. We, therefore, vacate the sentence.

For guidance on remand, we note that the journal entry in this case reflects that Randolph was sentenced to lifetime postrelease supervision. As the State concedes, Randolph was eligible for parole, and lifetime postrelease supervision does not apply. See, *e.g.*, *State v. Summers*, 293 Kan. 819, 832, 272 P.3d 1 (2012) (quoting *State v. Cash*, 293 Kan. 326, Syl. ¶ 2, 263 P.3d 786 [2011]). The other sentencing issue Randolph raises is whether a lifetime sentence is cruel and/or unusual punishment. Because we do not know whether a lifetime sentence will be imposed on remand, we will not address this issue.

Randolph's conviction is affirmed, his sentence is vacated, and the case is remanded with directions.