IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 117,941

STATE OF KANSAS,
*Appellee*,

v.

CRYSTAL DAWN GALLOWAY,
*Appellant*.

SYLLABUS BY THE COURT

1.

Generally, a defendant may obtain a change of venue only upon showing that publicity has displaced the judicial process entirely or that the judge is unable to control courtroom proceedings so as to provide a fair trial.

2.

A statement is not involuntary simply because a defendant was tired or under the influence of drugs; the condition must have rendered the defendant confused, unable to understand, unable to remember what had occurred, or otherwise unable to knowingly and voluntarily waive the right to remain silent.

3.

Both the United States Constitution and Kansas statutory law guarantee a criminal defendant the right to a public trial. The concept of a public trial implies that doors of the courtroom be kept open and that the public, or such portion thereof as may be

1

conveniently accommodated, be admitted, subject to the right of the court to exclude objectionable characters.

4.

A constitutional issue generally requires a specific challenge at trial in order to preserve it for appeal.

5.

An appellant bears the burden of designating a record that affirmatively shows prejudicial error. Without such a record, an appellate court presumes the action of the trial court was proper.

Appeal from Cherokee District Court; JEFFRY L. JACK, judge. Opinion filed March 13, 2020. Affirmed in part, vacated in part, and remanded with directions.

*Carol Longenecker Schmidt,* of Kansas Appellate Defender Office, argued the cause and was on the briefs for appellant.

*Natalie A. Chalmers*, assistant solicitor general, argued the cause, and *Derek Schmidt*, attorney general, was with her on the brief for appellee.

The opinion of the court was delivered by

ROSEN, J.: Crystal Dawn Galloway appeals from her conviction of one count of premeditated first-degree murder, one count of arson, and one count of interference with law enforcement, in addition to the imposition of a controlling hard 50 life sentence.

2

FACTS

As of May 2015, the State of Kansas had assumed custody of five of Galloway's children. Although Galloway was not permitted to have unsupervised visits with her oldest daughter, A.B., and Galloway was to have no contact with Galloway's boyfriend, Dakota Cunningham, she nevertheless maintained contact with both A.B. and Cunningham. Cunningham's employer, Robin Fought, learned about the improper contact and discussed his concerns with Galloway's caseworker on May 8 and May 12, 2015. Fought told the caseworker that he was worried Galloway was planning on kidnapping her children and removing them from the state.

On May 15, 2015, a water worker in rural Cherokee County came across a burning pickup truck in a field. Emergency responders extinguished the fire and discovered a man lying face down on the ground near the back of the truck. The man—identified later as Fought—had blood under his body. Sitting on his back was a gas can with torn telephone book pages stuffed into the spout. His body was partially burned and he had suffered multiple stab wounds. Near the truck and Fought's body were a knife and a sledgehammer with blood stains on them.

That evening, Galloway called a friend, Glenda Stevens, and told her that a lender was seeking to repossess her van. She asked Stevens to follow her and Cunningham to help her hide the van. They abandoned the van in Oklahoma, and Stevens gave Galloway and Cunningham a ride to a barn, where the two set up a camp site inside. Along the way, they told Stevens that Cunningham had stabbed Fought because Fought pulled a knife on him.

3

After dropping the two off at the barn, Stevens called the police and told them about the conversation. She gave the police Galloway's cell phone, which Galloway had left in Stevens' car for recharging. The phone contained photographs and messages relating to the crime scene and indicated that Galloway anticipated killing someone.

On May 17, the Cherokee District Court issued a warrant for Galloway's arrest for second-degree murder. Police officers found Galloway and Cunningham camping in the barn and arrested them on the morning of May 17. They took them back to Cherokee County and interrogated them simultaneously but separately. Through a gradually changing narration of the events, Galloway denied having anything to do with committing a murder and told the investigators that Cunningham said he killed Fought in self-defense and that her participation was limited to providing the means for him to escape. Galloway later told a niece that Fought was killed because he turned in A.B. for visiting Galloway and because he was not paying Galloway for work she was doing for him.

Police examined both Galloway's and daughter A.B.'s phones. At approximately 8:40 a.m. on May 15, Galloway had sent A.B. a text reading: "hey going to get me a snitch yay." A.B. replied: "be careful clean your tracks and phone." On both phones was a photograph of a list of items: "different tags and car, food, water, clothes, blankets, coats, weapons, scanner for police, no phones, money, diapers and wipes, cigarettes, masks, gloves, boots, lock pick, learn schedules, learn entrances and exits to houses, tents, matches, flashlights, batteries, extra gas, maps, survival books." The list was created on Galloway's phone on May 12.

Investigators also found pictures on Galloway's phone of the field where Fought's body was found and a nearby house. The picture of the house was taken about an hour

before the fire was discovered. Another picture showed Fought's body with stab wounds but not yet in the position where it was found and not yet burned. On A.B.'s phone was a picture of a note from Galloway's niece addressed to "my favorite Aunt"; the note contained a poem that ended: "Don't forget to murder rob ☺ YEA."

Police recovered DNA evidence showing that Galloway's blood was on the handle of the knife used to kill Fought. Her blood also was on the gas can and on the partially burned paper in the gas can.

The State charged Galloway with one count of premeditated first-degree murder, one count of aggravated arson, and one count of felony interference with law enforcement. Before trial, Galloway moved for a change of trial venue away from Cherokee County, arguing that extensive pretrial publicity and the relatively small pool of jurors would make it unlikely that she could receive a fair trial. The district court denied the motion. Galloway also moved to suppress statements she made during her interrogations, and the district court denied that motion as well.

A jury found Galloway guilty on all three charges. She was sentenced to a hard 50 life term for the murder conviction and concurrent terms of 13 months for the arson and 9 months for the interference with law enforcement convictions. She took a timely appeal to this court.

5

*Change of Venue*

Galloway initially challenges the district court's decision denying her motion to change venue. She argues this was error and she is entitled to a new trial in a different venue.

This court reviews the district court's decision on a motion to change venue pursuant to K.S.A. 22-2616(1) for an abuse of discretion. An abuse of discretion occurs "when the trial court makes an error of law; bases its decision on facts not supported by the evidence; or makes an arbitrary, fanciful, or unreasonable decision." *State v. Longoria*, 301 Kan. 489, 509, 343 P.3d 1128 (2015).

Galloway moved to change venue based solely on statutory grounds, specifically referring to K.S.A. 22-2616. K.S.A. 22-2616(1) directs a trial court to grant a defendant's motion to change venue if it "is satisfied that there exists in the county where the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial in that county." Media publicity alone is never sufficient to establish prejudice. *State v. Verge*, 272 Kan. 501, 508, 34 P.3d 449 (2001). The burden is on the defendant to show prejudice in the community, not as a matter of speculation but as a demonstrable reality. *State v. Higgenbotham*, 271 Kan. 582, 591, 23 P.3d 874 (2001).

In determining whether these circumstances exist so as to create prejudice under the statutory scheme, the trial court is to consider the following nine factors:

6

"'(1) the particular degree to which the publicity circulated throughout the community; (2) the degree to which the publicity or that of a like nature circulated to other areas to which venue could be changed; (3) the length of time which elapsed from the dissemination of the publicity to the date of trial; (4) the care exercised and the ease encountered in the selection of the jury; (5) the familiarity with the publicity complained of and its resultant effects, if any, upon the prospective jurors or the trial jurors; (6) the challenges exercised by the defendant in the selection of the jury, both peremptory and for cause; (7) the connection of government officials with the release of the publicity; (8) the severity of the offense charged; and (9) the particular size of the area from which the venire is drawn.'" *Longoria*, 301 Kan. at 510 (quoting *State v. Carr*, 300 Kan. 1, Syl. ¶ 10, 331 P.3d 544 [2014], *rev'd and remanded on other grounds* 577 U.S. ___, 136 S. Ct. 633, 193 L. Ed. 2d 535 [2016]).

In the district court, Galloway alleged that extensive media coverage of the murder and widespread discussion of the topic in the community, combined with the "high esteem" enjoyed by the victim, tainted any jury pool in the county. She attached articles in the press and online accounts of the investigation and charges. The State filed a response, arguing that the publicity was not excessive and Galloway had failed to demonstrate presumed prejudice.

Denying the motion, the district court judge said:

"Well, I have looked through the motion and the supporting documents and I have read the State's response, and while there was some publicity here I don't believe that it was untoward. In fact in my experience this is less publicity than some other cases that I've seen. I certainly don't think it reaches any kind of prima facie showing of any kind of prejudice. And there isn't any showing of actual prejudice here. I think what I would prefer to do is to go ahead and deny the motion so that we can go ahead and go on with this without it hanging over. But if during voir dire or some other information comes up

Mr. Myers [defense counsel] would have the opportunity to refile with that additional information."

The district court did not address the majority of the nine factors used to assess prejudice, but Galloway did not specifically argue those factors and did not request findings on them. Although Galloway argues on appeal that the district court failed to apply the factors to the specifics of her motion, she did not make that argument in district court.

For this reason, it is difficult or impossible to review the district court judge's findings for error. "Generally, litigants and their counsel bear the responsibility for objecting to inadequate findings of fact and conclusions of law in order to give the trial court the opportunity to correct such inadequacies, and, when there is no objection, omissions in findings are not considered on appeal." *McIntyre v. State*, 305 Kan. 616, 618, 385 P.3d 930 (2016). We, therefore, do not find error in the district court's omission of findings with regard to some of the nine caselaw factors set out in *Carr*.

Galloway also insists that the district judge erred by interjecting his own experience into the determination. The judge's statement, however, in light of the superficial evidence of prejudice that Galloway presented to him, is not incorrect and does not show a manifest abuse of discretion.

*Verge* is instructive on this point, i.e. the difficult burden that a party must sustain in order to demonstrate the necessity of changing venue. There, the defendant compiled a study based on statistics of 110 prospective jurors, showing their familiarity with the crime and their potential inability to decide a death penalty case, as well as instances of

racial prejudice. This court found no abuse of discretion because the district court was able to adequately screen jurors at voir dire for prejudice. 272 Kan. at 508.

Similarly, in *Higgenbotham*, 271 Kan. 582, the defendant complained of inflammatory publicity and presented the court with a survey:

> "The survey pool was made up of 302 residents in Harvey County. The survey concluded that 95.7% of the individuals surveyed recalled the case after being given a brief synopsis, 60.6% of the individuals believed the defendant was either probably or definitely guilty, and 53% of the residents with knowledge believed that there was at least some evidence that the defendant was guilty. The survey also found that Ellis County would be similar in make up to Harvey County but did not have the same problems with regard to publicity and knowledge of the case." 271 Kan. at 593.

The district court nevertheless denied the motion, and this court, finding no abuse of discretion, affirmed, holding:

> "Reasonable persons could disagree with the trial court's determination in light of the extensive pretrial publicity and survey evidence. However, it cannot be said that no reasonable person would agree with the trial court's decision to deny the motion, especially given the lack of evidence showing any problems in selecting a jury." 271 Kan. at 595.

This court cited to other cases finding no abuse of discretion for not changing venue: *State v. Jackson*, 262 Kan. 119, 129-34, 936 P.2d 761 (1997) (finding no abuse of discretion even though 82% of the respondents recalled at least some specifics about the incident and more than 60% thought the defendant was probably or definitely guilty); *State v. Swafford*, 257 Kan. 1023, 1035-37, 897 P.2d 1027 (1995) (57.1% of those

9

surveyed felt the evidence was strong against the defendant); *State v. Anthony*, 257 Kan. 1003, 1013-15, 898 P.2d 1109 (1995) (finding no abuse of discretion even though 97.5% of those surveyed had heard of the case and 63.8% of those surveyed felt the evidence was strong against the defendant). 271 Kan. at 594.

In the present case, Galloway provided no evidence of prejudice beyond articles and a few Internet comments. In fact, the judge gave Galloway the opportunity to reassert the motion if additional evidence of community-wide prejudice came up during subsequent proceedings, and Galloway did not follow up on the motion. Our caselaw tells us this is simply not enough to warrant finding an abuse of discretion in denying a motion to change venue. Meeting the defendant's burden is a "steeply uphill battle." *State v. Roeder*, 300 Kan. 901, 909, 336 P.3d 831 (2014). "[G]enerally a defendant can obtain a change of venue only upon showing that publicity has displaced the judicial process entirely or that the courtroom proceedings more resemble a circus or a lynch mob." *Longoria*, 301 Kan. at 506. Galloway makes no such showing here.

Galloway does not demonstrate reversible error in this issue.

*Suppression of Interrogation*

Two days after Fought's body was discovered, Galloway and Cunningham were arrested in Oklahoma and transported back to Kansas. Galloway was interviewed at length by Kansas Bureau of Investigation Senior Special Agent James Botts and another investigator, and, during the course of the interrogation, she made statements that were later used to impeach her trial testimony. She moved to suppress those statements, and the district court denied the motion. She argues on appeal that the district court erred

10

because her statements were not voluntary. After reviewing her arguments and a video recording of the interrogation, we conclude that no error occurred.

This court uses a bifurcated standard of review when considering a district court's decision on a motion to suppress evidence. *State v. Patterson*, 304 Kan. 272, 274, 371 P.3d 893 (2016). First, it reviews the district court's factual findings to determine whether they are supported by substantial competent evidence. 304 Kan. at 274. In reviewing the factual findings, this court does not reweigh the evidence or assess the credibility of witnesses. 304 Kan. at 274. Second, this court reviews the ultimate legal conclusion de novo. 304 Kan. at 274.

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." This privilege against self-incrimination is made applicable to the states through the Fourteenth Amendment Due Process Clause. *Malloy v. Hogan*, 378 U.S. 1, 6, 84 S. Ct. 1489, 12 L. Ed. 2d 653 (1964). *Malloy* instructs that the government is "constitutionally compelled to establish guilt by evidence independently and freely secured, and may not by coercion prove a charge against an accused out of his own mouth." 378 U.S. at 8. The privilege guarantees "the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty . . . for such silence." 378 U.S. at 8.

When a defendant challenges his or her statement to a law enforcement officer as involuntary, the prosecution must prove the voluntariness of the statement by a preponderance of the evidence. In determining whether the statement was the product of an accused's free and independent will, a district court looks at the totality of the

circumstances surrounding the statement and determines its voluntariness by considering a nonexclusive list of factors. *State v. Randolph*, 297 Kan. 320, 326, 301 P.3d 300 (2013).

These factors are: "(1) the accused's mental condition; (2) the manner and duration of the interrogation; (3) the ability of the accused to communicate on request with the outside world; (4) the accused's age, intellect, and background; (5) the fairness of the officers in conducting the interrogation; and (6) the accused's fluency with the English language." *State v. Johnson*, 286 Kan. 824, 836, 190 P.3d 207 (2008).

In *State v. Sharp*, 289 Kan. 72, 81, 210 P.3d 590 (2009), this court described the weight a court should give the six factors:

> "'[T]hese factors are not to be weighed against one another . . . , with those favorable to a free and voluntary confession offsetting those tending to the contrary. Instead, the situation surrounding the giving of a confession may dissipate the import of an individual factor that might otherwise have a coercive effect. [Citation omitted.] Even after analyzing such dilution, if any, a single factor or a combination of factors considered together may inevitably lead to a conclusion that under the totality of circumstances a suspect's will was overborne and the confession was not therefore a free and voluntary act. [Citations omitted.]'"

A statement is not involuntary simply because a defendant was tired or under the influence of drugs; the condition must have made the defendant seem confused, unable to understand, unable to remember what had occurred, or otherwise unable to knowingly and voluntarily waive the right to remain silent. See, e.g., *State v. Betancourt*, 301 Kan. 282, 291, 342 P.3d 916 (2015).

Galloway's interrogation lasted approximately two-and-a-half hours, during which time she was reasonably articulate and expressed a detailed memory of the events of the day of the murder. Her story changed several times, but she consistently denied participating in the murder except to the extent that she aided Cunningham in an attempted escape from the scene.

Galloway testified in her own defense at the trial. Her trial version differed in significant ways from the stories that she told during the interrogation. The jury was allowed to view the recorded interrogation for purposes of impeaching her trial testimony.

Galloway argues that the recording of her interrogation should have been suppressed because her mental state was so impaired that she was incapable of making voluntary statements. She argues that lack of sleep, low blood sugar, hunger, and pregnancy accompanied by gestational diabetes deprived her of the mental capacity to make voluntary statements.

Our existing caselaw demonstrates the weakness of Galloway's arguments.

In *State v. Holmes*, 278 Kan. 603, 613, 102 P.3d 406 (2004), the defendant argued that various factors, including drug use and sleep deprivation, impaired his ability to give a knowing and voluntary confession. But this court pointed out the testimony of detectives who stated that the defendant appeared coherent, answered questions rationally, and recalled events leading up to the shooting. In addition, he cooperated with the detectives and showed no signs of being under the influence of intoxicants except for appearing tired. The court noted that without evidence the defendant asked to sleep or

was not allowed to sleep, it could not conclude that sleep deprivation rendered his statement involuntary. 278 Kan. at 615.

Similarly, in *State v. Gonzalez*, 282 Kan. 73, 102, 145 P.3d 18 (2006), a defendant asserted that he had not slept for two days and was "strung out on drugs," thus rendering his interrogation remarks involuntary. This court noted that the defendant was responsive to questions and did not appear to have difficulty following the questioning. The defendant articulated a clear, detailed recollection of the criminal incident. He continued to answer questions without protest or complaint, and he did not seek contact with others outside the interrogation room. Finding no unfairness in the questioning process or signs of mental disassociation, this court affirmed the district court's conclusion that the interrogation was voluntary. 282 Kan. at 103-06; see also *State v. Young*, 220 Kan. 541, 547-48, 552 P.2d 905 (1976) (defendant did not appear out of touch with reality, speech and mentality did not appear impaired, and he appeared to have command of his faculties; drug use therefore did not preclude voluntariness); *State v. Bell*, 276 Kan. 785, 797, 80 P.3d 367 (2003) (defendant's speech was "clear and coherent" and he "actively engaged in conversation with the officers"; marijuana use before interview did not undermine voluntary nature of statements).

In the present case, substantial competent evidence supports the district court's finding that Galloway's statements were voluntary and were made without coercion. The interrogating officers specifically asked about drug use and whether Galloway understood their questions and understood what was going on. She did not inform the interrogating officers that she was impaired or unable to understand her circumstances. Although she appeared tired and slow of speech, her statements were clear and she attempted to describe in considerable detail her role in the killing. Her story changed as the interrogators pointed out inconsistencies or discrepancies with the physical evidence, but

14

her narrative consistently evolved throughout the interview. For example, she initially said that she walked away from her vehicle after it became stuck, but, when it was pointed out to her that a friend reported giving her a ride, she explained that she lied about that so as to avoid dragging the friend into the matter. She then acknowledged the friend's help during the remainder of the interrogation.

At no time during the interview did Galloway appear disoriented, incoherent, confused, or disassociated from reality. Instead, she provided detailed accounts of the sequence of events, how she injured her finger, why her story was evolving, and the nature of her relationships, such as with her children, her friend who gave her a ride, Cunningham, and the victim. Although it appears evident that she was often not truthful in her statements, the deceit appears to have served the purpose of minimizing her involvement in the killing and does not appear to have been the consequence of confusion or delusion.

We note that Galloway did not tell the interrogators that she was pregnant; she told them she might be pregnant. She did not tell the investigators she had gestational diabetes; she told them she did not have diabetes at the time but had experienced gestational diabetes during an earlier pregnancy. When she asked for "pop" during the interrogation because she was feeling light-headed from low blood sugar, the investigators provided her with a drink and a meal within 10 minutes. She informed the investigators that she did not have medication, alcohol, or drugs in her system, except possibly marijuana that she had smoked a few days earlier.

At the motion to suppress hearing, Galloway testified that she actually was pregnant during the interrogation. She testified that she had no education beyond the eighth grade but that she was able to read and write, albeit with some difficulty. She

15

testified that she was experiencing nausea and dizziness during the interrogation but acknowledged that she never told the investigators that she was feeling ill or was suffering from dizziness.

Although Galloway argues that she did not voluntarily make her recorded statements, she is challenged to articulate in what way the statements were involuntary. Her conduct during the interrogation demonstrated a grasp on reality and a lucid understanding of the proceedings. She did not request outside assistance, and she did not ask that the questioning stop. She answered all the questions, perhaps not honestly, but in such a way that she demonstrated that she understood the questions. Although the interrogation lasted for several hours, her most incriminating statements about having a cell phone came within the first 20 minutes. These statements tended to contradict her later trial testimony that she was not the person who made certain calls, sent certain texts, and took photographs of the crime scene.

There is a statutory test that limits the admissibility of a defendant's out-of-court statements relevant to the charged offense and sets out several conditions that the judge must find satisfied before admitting those statements. K.S.A. 2019 Supp. 60-460(f) states:

> "*Confessions.* [Hearsay evidence is inadmissible except] [i]n a criminal proceeding as against the accused, a previous statement by the accused relative to the offense charged, but only if the judge finds that the accused: (1) When making the statement was conscious and was capable of understanding what the accused said and did; and (2) was not induced to make the statement: (A) Under compulsion or by infliction or threats of infliction of suffering upon the accused or another, or by prolonged interrogation under such circumstances as to render the statement involuntary; or (B) by threats or promises concerning action to be taken by a public official with reference to the crime, likely to cause the accused to make such a statement falsely, and made by a person

16

whom the accused reasonably believed to have the power or authority to execute the same."

These statutory factors do not help Galloway. She was conscious and understood what had transpired. No threats were leveled against her. To be sure, the investigators several times told her she was lying and that things might go better for her later on if she told the truth, but they did not overtly coerce her. For example, they did not tell her that she could only have something to eat or drink if she changed her story to suit them, and they did not tell her that they would prolong the interrogation if she was not more forthcoming with the truth. She, in turn, did not ask to terminate the interrogation and did not tell them that she was feeling sick or was in some way unable to answer their questions truthfully.

Galloway does not make a sufficient showing that her statements were involuntary to warrant reversing the district court's denial of her motion to suppress.

*Jury Question*

After the jury began deliberating, it sent a question to the court relating to viewing the evidence. On the record and in the presence of counsel for both parties and Galloway, the court discussed the question and then sent an answer. Galloway maintains that the discussion did not take place in "open court" and the allegedly closed proceeding resulted in reversible error.

A defendant's right to be present at every critical stage of his or her trial raises an issue of law over which this court exercises unlimited review. *State v. Verser*, 299 Kan. 776, 787, 326 P.3d 1046 (2014). Similarly, review of violations of the right to an open

17

trial is unlimited. See *State v. Dixon*, 279 Kan. 563, 596, 112 P.3d 883 (2005), *overruled on other grounds by State v. Wright*, 290 Kan. 194, 224 P.3d 1159 (2010).

Both the United States Constitution and Kansas statutory law guarantee a criminal defendant the right to a public trial. See U.S. Const., amend. 6; *State v. Reed*, 302 Kan. 227, 237, 352 P.3d 530 (2015); *State v. Kirby*, 272 Kan. 1170, 1196, 39 P.3d 1 (2002); K.S.A. 2019 Supp. 22-3420(d). The concept of a public trial implies that doors of the courtroom be kept open and that the public, or such portion thereof as may be conveniently accommodated, be admitted, subject to the right of the court to exclude objectionable characters. *State v. McNaught*, 238 Kan. 567, 577, 713 P.2d 457 (1986) (citing 75 Am. Jur. 2d, Trial § 33, p. 146).

In the course of deliberating, the jury sent a handwritten question to the court: "Can we see the text messages?" The district court judge discussed the matter with both attorneys, and all three agreed that the texts were contained in an exhibit notebook that the jurors took with them into deliberations. The court then sent the jury a short handwritten answer: "Regarding the text messages, we believe they are in the red binder." No further questions came from the jury.

Galloway asserts that the discussion of the jury question took place in a closed courtroom setting. She further contends that such a setting violates her right to a public trial.

Although Galloway claims that the jury question was not considered in open court, the record is not at all clear on that point. After the jury retired to deliberate, the judge and counsel discussed arrangements for the alternate jurors. Part of that discussion was held at the bench. Afterwards, the court reporter noted:

18

"THE DISCUSSION AT THE BENCH CONCLUDES. DURING DELIBERATIONS THE JURY HAS A QUESTION AND THE ATTORNEYS, DEFENDANT AND JUDGE HAVE THE FOLLOWING DISCUSSION."

The court and parties then discussed the jury's question. The court reporter made no notation indicating that the discussion took place in closed court; to the contrary, it appears more likely that it occurred in open court. If that conclusion is erroneous and the discussion was indeed in closed court, a contemporaneous objection would have made that clear. As it is, this court is left to speculate just what the circumstances of the discussion were.

Constitutional issues generally require a specific challenge at trial in order to preserve the issue for appeal. See, e.g., *State v. Williams*, 298 Kan. 1075, 1083, 319 P.3d 528 (2014); *State v. Key*, 298 Kan. 315, 323, 312 P.3d 355 (2013). The requirement of a contemporaneous objection allows issues to be fully explored during the district court proceedings so that any error or potential error can be avoided. See, e.g., *State v. Raskie*, 293 Kan. 906, 914-15, 269 P.3d 1268 (2012). A timely trial objection helps ensure that a record is created that suffices for appellate review. *State v. McCullough*, 293 Kan. 970, 999, 270 P.3d 1142 (2012).

Nothing in the record informs this court that the discussion of the jury question was not conducted in open court. Galloway did not make a record of the asserted error, and we cannot determine that the error actually occurred. An appellant bears the burden of designating a record that affirmatively shows prejudicial error. Without such a record, we presume the action of the trial court was proper. *State v. Sappington*, 285 Kan. 176, 192, 169 P.3d 1107 (2007). We will not find error or reverse based only on an appellant's unsubstantiated speculation that error took place.

19

*Jury's Duty Instruction*

Galloway next contends that the district court impermissibly interfered with the jury's power to nullify a law when it instructed the jury that it should find her guilty if the facts supported such a finding.

The district court gave the following instruction regarding the jury's duty:

"The test you must use in determining whether the defendant is guilty or not is this: If you have a reasonable doubt as to the truth of any of the claims required to be proved by the State, you must find the defendant not guilty. If you have no reasonable doubt as to the truth of each of the claims required to be proved by the State, you should find the defendant guilty."

This court has recently addressed arguments of the type that Galloway raises here. In *State v. Patterson*, 311 Kan. ___, 455 P.3d 792, 799-800 (2020), we held that an instruction identical to the one in the present case was not erroneous. See also *State v. Boothby*, 310 Kan. 619, 630-32, 448 P.3d 416 (2019); *State v. Pruitt*, 310 Kan. 952, 453 P.3d 313, 326-27 (2019).

As in *Patterson* and *Boothby*, the instruction here was legally correct and simply stated the jury's duty to follow the law. Galloway has not demonstrated error, let alone reversible error, in arguing this issue.

*Mitigating Sentencing Factors*

Galloway moved for a downward departure from a hard 50 sentence, arguing, in part, that she had no criminal history. The district court announced that it would not

20

consider the absence of a criminal history as a mitigating factor because the Legislature had rejected that as grounds for mitigation. The State concedes this statement was contrary to the statutory sentencing scheme, and the question for this court to decide is whether the error was harmless.

This court reviews a district court's decision not to depart from a presumptive sentence for abuse of discretion. A district court abuses its discretion when no reasonable person would take the view adopted by the judge; a ruling is based on an error of law; or substantial competent evidence does not support a factual finding on which the exercise of discretion is based. *State v. McLinn*, 307 Kan. 307, 347-48, 409 P.3d 1 (2018).

K.S.A. 2019 Supp. 21-6625(a) sets out a nonexclusive list of mitigating circumstances that a district court may take into account when considering a reduced sentence. The first of these is that "[t]he defendant has no significant history of prior criminal activity."

Even though lack of a criminal history is the first statutorily enumerated mitigating factor, for some reason the district court judge here stated that the Legislature did not intend for that to be considered a mitigating factor. The judge stated:

> "Regarding the no prior felony convictions; the legislature made pretty clear that this is an off grid felony. They did not intend for prior criminal history to be involved in sentencing for premediated first degree murder. I think they have spoken on that issue. So that to me is not a compelling factor."

The State acknowledges that this statement was made as a matter of law and incorrectly stated the law. The State argues, however, that the judge's other comments

make it clear that he would have denied the motion even if he had followed the law. The judge pointed out reasons he considered compelling for denying the motion: the overwhelming evidence of guilt, the extensive planning and preparation for the crime, luring the victim to the site of the murder, and involving other people, including her children, in the scheme.

The subject of harmless error in not considering mitigating factors has come up in the context of *Alleyne* violations when a judge considered mitigating factors instead of a jury. *Alleyne v. United States*, 570 U.S. 99, 111-16, 133 S. Ct. 2151, 186 L. Ed. 2d 314 (2013), requires that juries, not judges, make determinations of aggravating factors. This court has stated it would only be in "rare instances when a hard 50 *Alleyne* error can be declared harmless." *State v. Hilt*, 299 Kan. 176, 205, 322 P.3d 367 (2014). This court has explained that even if overwhelming and uncontroverted evidence established the existence of an aggravating factor, it could not conclude beyond a reasonable doubt "that no rational jury would have determined that the mitigating circumstance outweighed the aggravating circumstance." *State v. Soto*, 299 Kan. 102, 127, 322 P.3d 334 (2014).

Here, it is not a matter of whether a jury would reach the same conclusion as the judge but whether the judge would reach the same conclusion if he had applied the proper mitigating factors. The sentencing judge was sharply critical of the defendant and was unlikely to consider her absence of prior convictions a factor that outweighed the heinous nature of her crime. But he should have considered that factor, and he openly refused to do so.

We cannot conclude, as a matter of law, that no rational judge would determine that a clean criminal history would not mitigate the various considerations weighing

against a downward departure. We, therefore, vacate the sentence and remand the case to the district court for resentencing.

CONCLUSION

We find no errors in the conduct of the trial, either in terms of procedure or admission of evidence, and we affirm the conviction. We vacate the sentence and remand to the district court with directions.

HENRY W. GREEN JR., J., assigned.[1]
STEVE LEBEN, J., assigned.[2]

_____

[1]**REPORTER'S NOTE:**  Judge Green, of the Kansas Court of Appeals, was appointed to hear case No. 117,941 vice Justice Johnson under the authority vested in the Supreme Court by K.S.A. 2019 Supp. 20-3002(c) to fill the vacancy on the court by the retirement of Justice Lee A. Johnson.

[2]**REPORTER'S NOTE:**  Judge Leben, of the Kansas Court of Appeals, was appointed to hear case No. 117,941 vice Chief Justice Nuss under the authority vested in the Supreme Court by K.S.A. 2019 Supp. 20-3002(c) to fill the vacancy on the court by the retirement of Chief Justice Lawton R. Nuss.