No. 120,854

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellant*,

v.

R.W.,
*Appellee*.

SYLLABUS BY THE COURT

1.

The Fifth Amendment to the United States Constitution protects an individual's right against self-incrimination. This right is extended to the states through the Fourteenth Amendment. The Kansas Legislature has codified the right against self-incrimination in K.S.A. 60-460(f).

2.

The touchstone consideration in cases involving issues of self-incrimination is voluntariness. The burden is on the State to prove—by a preponderance of the evidence—that confessions or inculpatory statements made to law enforcement officers are voluntary.

3.

Courts look at the totality of the circumstances on a case-by-case basis to determine whether impermissible coercion was present and whether that coercion overbore the defendant's free and independent will. Impermissible coercion can be either mental or physical.

4.

Generally, courts determine whether confessions or inculpatory statements made to law enforcement officers are voluntary by looking to the following nonexclusive factors: (1) the accused's mental condition; (2) the manner and duration of the interview; (3) the accused's ability to communicate on request with the outside world; (4) the accused's age, intellect, and background; (5) the officer's fairness in conducting the interview; and (6) the accused's fluency with the English language.

5.

When the accused is a juvenile, courts must exercise the greatest care and heightened sensitivity in assessing the validity of a confession or inculpatory statement made to law enforcement officers. In cases involving the custodial interrogation of juveniles and if legal counsel is not present, courts not only must make sure that a confession or inculpatory statement was not coerced but also that it was not the product of ignorance of rights or of adolescent fantasy, fright, or despair.

6.

In assessing the voluntariness of a juvenile's confession or inculpatory statements, courts are to consider five additional nonexclusive factors: (1) the juvenile's age; (2) the length of questioning; (3) the juvenile's education; (4) the juvenile's prior experience with law enforcement officers; and (5) the juvenile's mental state.

7.

Statements made to juveniles that are likely to mislead them regarding the nature and legal consequences of a custodial interrogation have the potential to render a confession or inculpatory statement involuntary.

8.

Even for an adult, physical and psychological isolation during a custodial interrogation can undermine an individual's will to resist and compel a person to speak when they would not otherwise do so freely. The risk of such isolation is even more troubling when the subject of the interrogation is a juvenile.

Appeal from Douglas District Court; PAULA B. MARTIN, judge. Opinion filed April 10, 2020. Affirmed.

*Kate Duncan Butler*, assistant district attorney, *Charles E. Branson*, district attorney, and *Derek Schmidt*, attorney general, for appellant.

*Branden Smith*, of Smith Legal, L.L.C., of Lawrence, for appellee.

Before STANDRIDGE, P.J., LEBEN and BRUNS, JJ.

BRUNS, J.: R.W.—who was a juvenile at the time—was interrogated for several hours at a police facility in Lawrence after being picked up from his high school by two police officers. Several months later, the State charged R.W. with multiple criminal counts including rape, aggravated battery, and other offenses. The district court certified him for trial as an adult. Prior to trial, the district court granted R.W.'s motion to suppress the statements he made during the interrogation because they were not voluntarily made. The State then filed this interlocutory appeal claiming that the district court erred in suppressing R.W.'s statements. After reviewing the record, we find no error. Thus, we affirm the district court's suppression order.

FACTS

In April 2017, R.W. was a 17-year-old junior at Free State High School. Although he was unaware of it at the time, R.W. was the subject of a rape investigation by the Lawrence Police Department based largely on allegations made by his former girlfriend. On the afternoon of April 25, a School Resource Officer (SRO)—who R.W. considered to be a mentor and a friend—introduced him to two Lawrence Police Officers, Lindsay Bishop and Joshua Leitner. Officers Bishop and Leitner were both wearing police vests with holstered guns.

The two officers presented themselves to R.W. by their first names—Lindsay and Josh—before briefly explaining:

> "We are, um, juvenile investigators, so we're just like a special kind of police officer that, it's our job to talk to kids, primarily. [W]e deal with stuff usually that sometimes happens at school but sometimes, like, out in the community. So, kind of like [the School Resource Officers], but have a little bit different job."

Officers Bishop and Leitner did not tell R.W. why they wanted to meet with him other than saying that they wanted to talk to him "about some stuff that occurred." Although the officers told R.W. that he was not under arrest, they did not tell him that he was the subject of a criminal investigation. Officer Bishop then requested that R.W. go with them in what she called a "super-secret," unmarked patrol vehicle to a police facility known as the Investigations and Training Center. She told R.W. that they would bring him back to school "when we're done talking."

R.W. agreed to go with the officers, and the SRO escorted him to the patrol vehicle. The SRO officer did not go with them to the police facility, and the police officers did not offer R.W. an opportunity to call his mother to tell her where he was going. While in the patrol vehicle, R.W. told Officers Bishop and Leitner about his

4

relationship with the SRO who had introduced them. He described the SRO as a "really nice guy" and a "nice mentor" whose son had recently died. R.W. then explained how he had bonded with the SRO since he had also recently lost his father.

After expressing sympathy for the death of his father, Officer Bishop again told R.W. that her job is "kind of like [an SRO], where we work with kids, but we . . . are not assigned to a school or anything." In addition, the officer told R.W. that she and Officer Leitner "just kind of talk to, um, kids when they are, like, the victim of a crime or when stuff like that is going on." She added, "instead of like a mentory role, we kinda do more, I don't know, other kinds of investigations."

Officer Leitner further explained that "a lot of times, the . . . guys in the schools, they don't have as much time to devote to longer-term . . . type of incidents with kids or crises that they're going through." Instead, the officer explained that such circumstances fall to them when there is "something going on that . . . needs . . . closer attention." Still, the officers did not reveal why they wanted to talk to R.W. nor did they inform him that he was the subject of a criminal investigation. During the rest of the drive, the officers talked casually with R.W. about his professional interests.

At the police facility, R.W. was left alone in the interrogation room for several minutes. While he was waiting, R.W. took several deep breaths and nervously picked at his fingers. When Officers Bishop and Leitner returned to the room, they talked to R.W. about being in high school and joked with him about the food served at a local restaurant where he had a part-time job. About 20 minutes after first meeting R.W. at the high school, Officer Bishop indicated that they wanted to "ask [him] some questions."

Officer Bishop then told R.W., "because you're here and because I drove you, um, and you're in the police station and it's like a locked facility and stuff like that, I am going to read you your *Miranda* rights, just like on TV, but you're not under arrest or anything

5

like that." She also told him that he could leave or "stop answering questions at any time." Officer Bishop added—while laughing—that the officers could take him "home or wherever . . . in Lawrence. I'm not going to take you to, like, Disney World." Before reading R.W. his *Miranda* rights from a laminated card, Officer Bishop casually added, "let me . . . read this thing . . . it's like, you know, a formality."

R.W.—a juvenile alone with two police officers in an interrogation room of a locked police facility and unaware of the purpose of their conversation—agreed to speak with Officers Bishop and Leitner. After he had done so, Officer Bishop told R.W. for the first time that she wanted to talk to him about his relationship with his former girlfriend. Before continuing, Officer Bishop again compared her role to that of an SRO but distinguished her job by telling R.W. that she focuses on things occurring outside of school.

Officer Bishop then began asking R.W. to talk about his relationship with his former girlfriend. Even then, there was no mention of a criminal investigation or the allegations made by his former girlfriend. R.W. explained that he and his former girlfriend began a romantic relationship in March 2015 that lasted until August 2016. He explained that things went well for a while before hitting "a rough spot" because of their mothers not getting along. Both R.W. and his former girlfriend had lost their fathers.

According to the record, R.W. had found his father's body after a car fell on top of him a little over a year before the relationship with his former girlfriend started. R.W. told the officers that the conflict with his former girlfriend was hard for him because he was still "emotionally unstable" after the death of his father. He explained that the relationship between he and his former girlfriend became "toxic" before it finally ended. Officers Bishop and Leitner offered reassurance to R.W. while he told his story.

6

The officers told R.W. that they did not think he was "a bad person" and stated that they realized jealousy is a significant issue "when you're 15 . . . and you're new in a relationship." Officer Leitner added, "we're just trying to understand." R.W. then told the officers that his former girlfriend did not trust him because he had lied, insinuating potential drug or alcohol use with his friends. Again, the officers were quick to reassure R.W. that they were "not here to get you in trouble for anything like that" and offered their own examples of problems they had caused as teenagers. Officer Leitner told R.W., "when you're a teenager you . . . do goofy things like that."

Officer Bishop refocused the conversation by telling R.W., "we're just trying to kind of understand what your guys' relationship was like and maybe some of the issues that you had." Yet, she still did not tell R.W. that he was being investigated in a criminal matter. Officer Leitner then asked R.W. if any of his arguments with his former girlfriend had become physical. In response, R.W. acknowledged that he did "get out of control" a few times during the relationship and admitted to grabbing her arm. In response, Officer Leitner told R.W. that his behavior was "kind of normal for a kid that's 15, 16 years old" and that "part of the growing process is learning how to, like, control your frustration, control your anger and communicate effectively."

The officers then asked R.W. for more details about any arguments during his relationship with his former girlfriend that may have gotten out of control. After several minutes, Officer Bishop pressed R.W. about a specific incident at school in which he allegedly pushed his former girlfriend off a chair. The incident would later be the basis for an aggravated battery charge brought against R.W. Although he denied that he had pushed her off a chair, the officers continued to question R.W. on the subject. After nearly 10 minutes of denials and being pressed for an additional explanation, R.W. told the officers that his former girlfriend would "lie about a lot of things."

7

At that point, about 40 minutes into the interrogation, R.W. told the officers that it was possible that his former girlfriend might claim that he had raped her. Indeed, the officers were acutely aware of this allegation since they had interviewed R.W.'s former girlfriend a month earlier. R.W. then explained in general terms how he had manipulated his former girlfriend into having sex. In response, Officer Bishop reassuringly told R.W., "thank you for sharing that with us and talking about this, and we'll figure it out together, okay?"

When asked to describe his first sexual encounter with his former girlfriend, R.W. struggled to remember the details. At that point, Officer Leitner whispered to R.W., "It's okay to be honest. It's okay. . . . I want to say, we've heard everything before. You know what I mean." R.W. then began nervously sharing intimate details of his first sexual encounter with his former girlfriend. When asked whether he ever continued to have sex with her after being told to stop, R.W. initially denied having done so. But when pressed again by Officer Leitner, he admitted that she had told him to stop. Officer Bishop then told R.W. to take a big breath, and Officer Leitner added, "it's going to be okay."

After asking if R.W. felt better, Officer Bishop went on to tell R.W.:

"So, [R.W.], what I think is . . . that you are a really smart, articulate young man who has a super bright future; and I think you have been through a lot in your short life. I think you've been through more than any of us should ever have to go through with witnessing trauma and having, um, . . . a family destroyed, um, and then having a complicated relationship with a [former] girlfriend and her mom being controlling. Um, and I think you've been through more than, than anybody really ever should, but, more in your, and these are pivotal developmental years.

"Um, and I think that you had some anger and some frustration, and you're trying to figure out how to control that and how to deal with that and how to move forward and how to figure out who you are and what your priorities are and what your morals are and all those kind of things.

8

"And I don't think that you're a bad kid and [Officer Leitner] doesn't think you're a bad kid. And we think you're just trying to figure out who you are and what you're about, okay?

"And I know from doing this for years and years and years that sometimes when you hold in a secret like that, like I could just see you, um, you know, just so stressed, and, um, that it feels better just to come clean and to come to terms, . . . and to own what we did, and be honest about what we did, so that we can heal and move forward and, and so that [your former girlfriend] can heal and move forward. Okay?

"And I want to go through this process, and I want to make sure that, that we understand and we get out everything on the table today that we need to talk about so that you can heal and clear your conscience and say, you know what, I'm going to leave all of that that I've been holding inside here, I'm going to leave it right here.

"I'm going to walk away from that, and I'm going to move forward, and I'm going to have a successful future, um, and [your former girlfriend]'s going to heal, and she's going to be able to move past this and, and move on with her life, too."

Immediately after Officer Bishop said this, Officer Leitner also reassured R.W., saying:

"Nobody expects you to be perfect. Right? [Your former girlfriend]'s not perfect, you're not perfect. I'm not perfect. That's okay.

"You know, that's part of growing up, is making mistakes and figuring out, you know, what you did wrong and figuring out how to handle something that you [did] wrong, so that you can grow as a person.

"And, and obviously we . . . don't want to make mistakes again. The only way we can do that is by learning from them, alright? And that's as much a part of this process as everything. Alright? That's okay. That's . . . what being a teenager's all about is growing and learning. Alright? Okay."

9

At this point, the officers had still not told R.W. that he was the subject of a criminal investigation. Instead, Officer Bishop and Officer Leitner told him that what had happened between he and his former girlfriend was part of "being a teenager" and "growing up." They also told him that they just wanted to "understand" the nature of the relationship so that R.W. could "clear his conscience," "heal," "leave it all there," "walk away," "move forward," and "have a successful future." After hearing repeated reassurances for nearly 70 minutes, R.W. began to make additional inculpatory statements to the officers.

After more than three hours of questioning, R.W. was asked by Officer Bishop what he thought should happen next. Echoing the reassurances given to him by the officers, R.W. said that he "would like to be able to move past this." Then, Officer Leitner asked R.W. if he thought there should be legal punishment for what he did to his former girlfriend. R.W. responded that he "hope[d] not" and did not know what would be appropriate.

Officer Bishop interjected that she "want[ed] to be on front street" and told R.W. that she was going to submit a report to the District Attorney's Office for prosecution. For the first time—after nearly four hours alone with the officers—Officer Bishop suggested that "we do kinda need to tell your mom what's going on." In response, R.W. said that his mother was "probably wondering why I'm not home by now." A few minutes later, Officer Bishop asked R.W. whether he had any questions. Expressing concern, R.W. asked the officers what the "worst case scenario" might be and he was told that he could face prosecution as an adult as well as imprisonment for the crime of rape.

The officers then asked R.W. whether he felt "suicidal" and noted his prior mental health issues—which they had evidently learned from previous witness interviews. Although R.W. denied having suicidal feelings, the officers offered to drive him to the hospital if he ever had a mental health crisis in the future. At that point, the officers

10

briefly left the interrogation room. After they did so, R.W. dropped his head and took several deep breaths. A short time later, the officers returned and took R.W. home.

On August 28, 2018, the State charged R.W.—who had been certified to be tried as an adult—with multiple counts of rape as well as several other criminal offenses. Prior to trial, R.W. moved to suppress the statements he had made to Officers Bishop and Leitner during his interrogation. The district court held an evidentiary hearing on the motion. In addition to hearing the testimony of Officer Bishop and listening to the argument of counsel, the district court judge noted that she had reviewed the video of the interrogation multiple times.

On January 30, 2019, the district court entered a nine-page memorandum decision in which it granted R.W.'s motion to suppress. In doing so, the district court set forth findings of fact—describing the recordings of the interrogation in detail—and conclusions of law. Ultimately, the district court concluded "that based on the totality of these circumstances, the statements made by [R.W.] were not the product of a free and independent will. The promises, benefits, and reassurances made by the officers resulted in defendant's will being overborne."

Thereafter, the State filed this interlocutory appeal pursuant to K.S.A. 2019 Supp. 22-3603.

## ANALYSIS

On appeal, the State argues that "the cordial tone of the interview did not render [R.W.'s] *Miranda* waiver involuntary, and the officers did not coerce or trick him into confessing. In short, the district court should not have suppressed his statements, and the State respectfully requests this court reverse that decision." In response, R.W. argues that the district court appropriately found that "[t]he totality of the circumstances

11

demonstrates [his] statements are not voluntary, nor are they free from coercion or suggestion."

Our review of a district court's decision on a motion to suppress evidence is bifurcated. We review the factual underpinnings of the decision to determine whether they are supported by substantial competent evidence while our review of the ultimate legal conclusion drawn from those facts is de novo. *State v. Lowery*, 308 Kan. 359, 364, 420 P.3d 456 (2018). Substantial competent evidence is evidence that a reasonable person could accept as adequate to support a conclusion. In determining whether the district court's findings of fact are supported by substantial competent evidence, we do not reweigh the evidence, assess the credibility of witnesses, or resolve evidentiary conflicts. *State v. Boggess*, 308 Kan. 821, 825, 425 P.3d 324 (2018).

The Fifth Amendment to the United States Constitution protects an individual's right against self-incrimination. Moreover, this right is extended to the states through the Fourteenth Amendment. *Chavez v. Martinez*, 538 U.S. 760, 766, 123 S. Ct. 1994, 155 L. Ed. 2d 984 (2003); *Malloy v. Hogan*, 378 U.S. 1, 6-11, 84 S. Ct. 1489, 12 L. Ed. 2d 653 (1964). The Kansas Legislature has codified the right against self-incrimination in K.S.A. 2019 Supp. 60-460(f). See *State v. Guein*, 309 Kan. 1245, 1261-62, 444 P.3d 340 (2019). A confession is coerced—and inadmissible at trial—when a defendant's "will was overborne." *Yarborough v. Alvarado*, 541 U.S. 652, 667-78, 124 S. Ct. 2140, 158 L. Ed. 2d 938 (2004); see also *Schneckloth v. Bustamonte*, 412 U.S. 218, 225-26, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973).

The touchstone consideration in cases such as this is voluntariness. *State v. Palacio*, 309 Kan. 1075, 1087, 442 P.3d 466 (2019). The burden is on the State to prove that confessions or inculpatory statements made to law enforcement officers are voluntary. In determining whether a defendant's statements are voluntary, we look at the totality of the circumstances. *State v. Randolph*, 297 Kan. 320, 326, 301 P.3d 300 (2013).

12

"The essential inquiry is whether the statement was the product of the free and independent will of the accused." *State v. Groschang*, 272 Kan. 652, 662, 36 P.3d 231 (2001).

When a defendant claims that a law enforcement officer used coercion to obtain incriminating statements, the State bears the burden to prove—by a preponderance of the evidence—that the defendant made the statements voluntarily. *State v. Garcia*, 297 Kan. 182, 188, 301 P.3d 658 (2013). Kansas courts employ a case-by-case evaluation to determine whether impermissible coercion was present and whether that coercion overbore the defendant's free and independent will. *Guein*, 309 Kan. at 1260. Impermissible coercion can be either mental or physical. *State v. Stone*, 291 Kan. 13, 21, 237 P.3d 1229 (2010).

Generally, courts determine whether a confession or statement made to law enforcement officers was voluntary by looking to the totality of the circumstances, aided by the following nonexclusive factors:  (1) the accused's mental condition; (2) the manner and duration of the interview; (3) the accused's ability to communicate on request with the outside world; (4) the accused's age, intellect, and background; (5) the officer's fairness in conducting the interview; and (6) the accused's fluency with the English language. *State v. Gilliland*, 294 Kan. 519, Syl. ¶ 3, 276 P.3d 165 (2012).

In addition, when—as here—the accused is a juvenile, courts must exercise "'the greatest care'" in assessing the validity of a confession or statement made to a law enforcement officer. *State v. Mays*, 277 Kan. 359, 373, 85 P.3d 1208 (2004). In cases involving the interrogation of juveniles and counsel is not present, courts must exercise great care "'to assure that the admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair.'" *State v. Donesay*, 265 Kan. 60, 69, 959 P.2d 862 (1998) (quoting *In re Gault*, 387 U.S. 1, 55, 87 S. Ct. 1428, 18 L. Ed. 2d 527 [1967]); see

13

also *State v. Gibson*, 299 Kan. 207, 215, 322 P.3d 389 (2014) ("A juvenile's inculpatory statement must be voluntary and free from coercion or suggestion and must not be the product of ignorance of rights or adolescent fantasy, fright, or despair.").

Accordingly, when assessing the voluntariness of a juvenile's confession or inculpatory statements, Kansas courts have articulated five additional nonexclusive factors for consideration. *State v. Young*, 220 Kan. 541, 546-48, 552 P.2d 905 (1976). These factors include: (1) the juvenile's age; (2) the length of questioning; (3) the juvenile's education; (4) the juvenile's prior experience with law enforcement officers; and (5) the juvenile's mental state. 220 Kan. at 546-48. "Clearly, there is overlap among the factors articulated in a case involving a juvenile and those usually considered when the voluntariness of a defendant's statement to [law enforcement officers] is at issue; but just as clearly, our caselaw recognizes a heightened sensitivity when the accused is a juvenile." *Gibson*, 299 Kan. at 215.

Under our standard of review, we first examine the record on appeal to determine if it is competent and substantial enough to support the district court's findings of fact. Here, there are recordings that tell us exactly what was said by the officers as well as what was said by R.W. This evidence includes both an audio recording of R.W.'s brief trip with the officers to the police station and a video recording of R.W.'s interrogation. Although the State may disagree with the district court's interpretation of the evidence, we conclude that substantial competent evidence supports the district court's factual findings set forth in a comprehensive nine-page, single spaced, memorandum decision.

We also find the district court applied the correct legal analysis in this case. Specifically, the district court looked to the general factors set forth in *Gilliland*, 294 Kan. 519, Syl. ¶ 3, as well as the additional factors for juveniles set forth in *Young*, 220 Kan. at 546-48. In applying these factors, the district court found:

14

"[R.W.] was seventeen (17) years old and a junior in high school. He had no prior experience with law enforcement except the SROs at school, with whom had a good relationship and who he saw as a mentor. Although they are police officers, their role in the school is very different from the role of juvenile investigators. They are there to help the kids in a non-adversarial role, to build positive relationships and serve as mentors. [R.W.] knew [the] SRO . . . and considered him a good guy and a mentor. They bonded over the death of loved ones, [R.W.] having lost his father and [the SRO] his son. [The SRO] also helped [R.W.]'s brother through 'some stuff.'

"When Officer Bishop and Officer Leitner arrived at Free State High School, unannounced, they contacted [R.W.] with the help of [the SRO]. They introduce themselves not as Officer Bishop and Officer Leitner but only by their first names. They tell [R.W.] their job is 'kind of like [the SRO's].' They tell him they 'talk' to kids when they are 'victims of a crime or when stuff like that is going on.' While that may be part of their duties it is certainly not why they want to talk to [R.W.].

"[R.W.] agreed to go to the ITC to talk with them, although he is not told he has an option. At the ITC, [R.W.] still has not been told why they want to talk to him, only according to Officer Bishop, that she wants to ask him some questions. The interview is lengthy—four (4) hours. [R.W.]'s mental condition or state left him vulnerable. He told this to the officers and they sympathized with him telling him he 'had been through a lot in his short life . . . [M]ore than any of us should have to go through with witnessing trauma and having a family destroyed . . . [.'] They had been told [R.W.] was sad and depressed and had been hospitalized for mental health issues. From the onset, he told them he was 'emotionally fragile' and was 'going through a lot.' He was not given the option of having a parent present or given the opportunity to call his mom."

The district court further found:

"Still not knowing why they want to talk with him, [R.W.] waived his rights. Up until [R.W.] says that [his former girlfriend] tells lies and is telling people he raped her, everything is chatty, chummy. They refer to their talk with [R.W.] as a 'conversation.' He is told they just want to understand what your guys' relationship was like. [R.W.] has been given no reason to think this is different from his conversations with [the SRO].

15

They help kids. They want to understand him. He is not told they are investigating a crime. He is not told he is a suspect in a crime. In fact, he is never told why they want to talk to him. It's almost like a therapy session. They lead him to believe that they are there to make things better, to understand and to help him.

"The level of the officers' omissions about their purpose is illustrated when, after about fifty three (53) minutes, [R.W.] says: 'I don't know if you're aware but one of the big ones [lies] is the possibility that I'd been raping her.' So they encourage him to just tell them about that, still not knowing that this is the subject of their investigation or even that it is an investigation.

"[R.W.] continues to talk a bit more about the relationship with [his former girlfriend]. When he hesitates Officer Bishop tells him to take a big breath. Officer Leitner tells him 'it's going to be okay.' Then comes Officer Bishop's big speech which is set out in full [above], and Officer Leitner's affirmation that [R.W.] just needs to learn from his mistakes; that's 'as much a part of this process as everything.' It's okay. 'That's what being a teenager's all about is growing and learning.' [R.W.] has now been reassured by both officers that nothing will happen if he 'gets it all out.' He can leave it all there. He can walk away and move forward and have a successful future. The interrogation continues and [R.W.] makes further incriminating statements."

The record reflects that R.W. and the SRO bonded during a vulnerable period of mutual grief after the death of R.W.'s father and the death of the SRO's son. Prior to the interrogation, R.W.'s only experience with law enforcement was with the SRO, with whom he had a "mentor" relationship. Nothing in the record suggests that R.W. had ever had an adversarial interaction with a law enforcement officer or had previously been involved in a criminal investigation. As the district court appropriately noted, R.W.'s experience with law enforcement officers was based on emotional support, vulnerability, and trust.

The record confirms that Officers Bishop and Leitner introduced themselves to R.W. using their first names rather than using their professional titles. This informality

16

had the potential to confuse the roles of the SRO and the investigating officers. This confusion was amplified by the repeated comparisons drawn by Officers Bishop and Leitner between their roles and the SRO's role. In particular, the officers repeatedly represented to R.W. that their job was much like the SRO's position and that their primary role was also to "talk to kids." Indeed, the only significant distinction that Officers Bishop and Leitner provided was that—unlike an SRO that focuses on school issues—they focus on things that happen "out in the community."

We note that Officer Bishop did tell R.W. that her role was less "mentory" than the role of the SRO and she did "other kinds of investigations." Still, neither she nor Officer Leitner told R.W. that they were performing a criminal investigation or talking to him for that reason. Instead, as the district court accurately pointed out, Officer Bishop went so far as to tell R.W. that they talk to kids who are "victims" of crimes. Likewise, Officer Leitner bolstered the potential for confusion by adding that he and Officer Bishop work with kids on "longer-term" incidents and "crises that they're going through."

We agree with the district court that the statements made by Officers Bishop and Leitner had the significant potential to confuse a juvenile about the purpose and the gravity of his "talk" with the officers. We also agree with the district court that "the fairness of the officers conducting the interrogation, is the crucial factor in this case." In this regard, the district court paid particular attention to the frequent reassurances that Officers Bishop and Leitner offered to R.W. throughout the four hours that they spent with him.

The district court also expressed concern that the officers conducted much of the interrogation like a "therapy session" instead of a criminal investigation. The district court's concern is reasonable in light of the following statement made by Officer Leitner to R.W. during the interrogation:

17

"I don't think you're a bad kid. I really don't. Alright? But I also, like [Officer Bishop] was explaining earlier, you know, I think you're a kid who's growing up. I think you're a kid who's maybe done some things that you regret. And I think you're a kid who's maybe made some bad choices. And I think there is every kid out there who's 17 years old, has probably made bad choices. Right? So, I'm not saying you're a bad kid because you made bad choices.

"But, at the same time, we can't move on, and learn, and grow from our bad choices until we come to terms with what really happened. And until we come to terms with things that we're not proud of, and things that might have hurt somebody. Right?

"And they can't move on, sometimes, until that whole thing, you know, comes out, and is realized, and, and there is a discussion about it. *I mean, and that's why counseling works. You know what I mean, because we've got to talk about things sometimes for them to make sense in our heads.*

"*So, part of what we're doing here is, is, maybe we're kind of de facto counselors today. Right, and that's part of what we're doing is trying to just work through what happened. Alright?*" (Emphasis added.)

As the district court noted, Officers Bishop and Leitner repeatedly made statements that suggested that R.W.'s behavior was normal for a person his age and insisted that they were "just trying to understand." For instance, the officers empathized that jealousy was difficult, particularly for a teenager who was new to romantic relationships. When R.W. hinted at possible drug use, the officers insisted that it was a normal, "goofy," teenage behavior. Even when R.W. admitted that he grabbed his former girlfriend's arm during arguments, the officers reassured him that his behavior was "kind of normal for a kid that's 15, 16 years old," emphasizing that "part of the growing process" was working on "expressing [himself] a little bit better."

When the conversation shifted to the sexual nature of R.W.'s relationship with his former girlfriend, his demeanor changed, and he stopped speaking. In response, Officers

18

Bishop and Leitner made a series of reassurances to R.W. that the district court found could have easily misled him into believing that the stakes in his continuing to talk with the officers were low. Like the district court, we find the following statement made by Officer Bishop to R.W. to be particularly problematic:

> "And I want to go through this process, and I want to make sure that, that we understand and we get out everything on the table today that we need to talk about so that you can heal and clear your conscience and say, you know what, I'm going to leave all of that that I've been holding inside here, I'm going to leave it right here.

> "I'm going to walk away from that, and I'm going to move forward, and I'm going to have a successful future, um, and [your former girlfriend]'s going to heal, and she's going to be able to move past this and, and move on with her life, too."

To a juvenile—especially one whose only experience with a law enforcement officer prior to the interrogation had been a relationship much like that of a guidance or grief counselor—these types of reassurances are at best misleading. The misleading nature of such statements is even more significant when viewed considering the comparisons between the SRO's role and that of Officers Bishop and Leitner. Although the officers may have had good intentions, statements made to juveniles that are likely to mislead them regarding the nature and legal consequences of an interrogation have the potential to render a confession involuntary.

As the district court also highlighted, the potential for confusion was exacerbated by the fact that the officers did not disclose the true purpose of their "talk" with R.W.— which was to discuss the potential for legal liability for the crime of rape—until several hours after the interrogation began. In addition, like the district court, we also find the length of the interrogation to be significant. We note that our court has previously found an interrogation lasting less time than the one in this case to be a "lengthy interrogation"

19

that can tip the scales in favor of the accused. See *State v. Bowlin*, 43 Kan. App. 2d 671, 690-91, 229 P.3d 402 (2010).

It is important to recognize that "[e]ven for an adult, the physical and psychological isolation of custodial interrogation can 'undermine the individual's will to resist and . . . compel him to speak where he would not otherwise do so freely.'" *J.D.B. v. North Carolina*, 564 U.S. 261, 269, 131 S. Ct. 2394, 180 L. Ed. 2d 310 (2011). The risk of isolation "is all the more troubling . . . when the subject of custodial interrogation is a juvenile." 564 U.S. at 269. Of course, we recognize that the law does not require juveniles older than 14 the opportunity to have a parent present during a criminal interrogation. *In re B.M.B.*, 264 Kan. 417, 432, 955 P.2d 1302 (1998). Nevertheless, we do not find that it was error for the district court to take R.W.'s isolation into consideration under the circumstances presented in this case.

This is particularly significant where a juvenile who lacks experience with the criminal justice system and has lost his father is concerned that his mother is "probably wondering" why he has not come home from school. A review of the interrogation video shows R.W. hesitating, asking for water, and nervously picking at his nails at several points. Similarly, R.W. is observed on the video taking deep breaths and hanging his head when left alone at the various times during the interrogation. Ultimately, at the end of the interrogation, Officers Bishop and Leitner ask R.W. whether he had any suicidal ideations and noted his prior mental health status before finally taking him home.

We agree with the district court that R.W.'s mental state likely "left him vulnerable" given the proximity between the death of R.W.'s father and the start of R.W.'s relationship with his former girlfriend. In addition, as the district court noted, R.W. expressed concerns about "emotional instability" during the relationship which he specifically attributed to the loss of his dad. The record also reveals that Officers Bishop and Leitner expressed empathy for R.W.'s loss and reassured him that they understood

20

the "trauma" of "having [his] family destroyed" was more than anybody should have to deal with in their "pivotal developmental years." We find that discussions of this nature about a juvenile's current or prior mental health issues have the potential to suggest mental vulnerability and, therefore, a higher potential for coercion.

As indicated above, the test for suppression is fact-driven and based on a consideration of the "totality of the circumstances." *State v. Randolph*, 297 Kan. 320, 326, 301 P.3d 300 (2013). Furthermore, we are to exercise "'the greatest care'" or "heightened sensitivity" when assessing whether a juvenile's confession is voluntary. *Mays*, 277 Kan. at 373; *Gibson*, 299 Kan. at 215. We recognize that reasonable people could weigh the factors differently. However, even if it is assumed that the *Miranda* warning was properly given to R.W., we find that the totality of the circumstances suggest that his confession was not the product of a free and independent will. For these reasons, we affirm the district court's decision to suppress the statements made by R.W. during the interrogation.

Affirmed.