NOT DESIGNATED FOR PUBLICATION

No. 120,990

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

AARON RAY SUITER,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; KEVIN J. O'CONNOR, judge. Opinion filed December 18, 2020. Affirmed.

*Peter Maharry*, of Kansas Appellate Defender Office, for appellant.

*Matt J. Maloney*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before ATCHESON, P.J., SCHROEDER and WARNER, JJ.

PER CURIAM: After a night of drinking, Aaron Suiter got into a heated argument with his girlfriend, Bryena McQuitty. When Suiter awoke the next morning, he found McQuitty dead in bed next to him, apparently strangled. Because Suiter had been intoxicated the night before, he did not remember significant portions of what had happened, including the killing.

1

A jury convicted Suiter of second-degree murder. He now appeals that conviction, claiming various evidentiary rulings, individually or in combination, deprived him of a fair trial. After carefully considering the record and the parties' arguments, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Late on the evening of November 25, 2017, Suiter and McQuitty went to a local Wichita bar. When the bar closed around 2 a.m. the next morning, Suiter had already left. McQuitty, who received a ride from acquaintances, returned home around 2:30 a.m. and began looking for Suiter. At some point, at McQuitty's request, Suiter's roommate called Suiter to find out where he was; Suiter, who sounded out of it, stated he was at the corner. Suiter eventually came home between 5 and 5:30 a.m., and he and McQuitty began yelling at each other. After several minutes, the yelling subsided.

At about 10:30 a.m., Suiter frantically knocked on a neighbor's door. Suiter told the neighbor that McQuitty was not breathing and asked him to call 911. When emergency personnel arrived, they determined McQuitty was dead and likely had been for quite some time. Wichita police noted bruising around her neck; a subsequent autopsy indicated she had been strangled. Suiter had scratches on his neck; later DNA tests of swabs taken from McQuitty's fingernails and neck were consistent with Suiter's DNA.

Later that morning, police took Suiter to the Wichita Police Department and placed him in an interrogation room for an interview. Suiter was only wearing his underwear when he was taken into custody, though a police officer gave him a blanket to wrap himself. After about 3-1/2 hours, during which Suiter largely slept on the floor and was periodically checked on by officers, a detective interviewed him. Suiter waived his *Miranda* rights and agreed to speak. He explained that he had quite a bit to drink at the bar, left McQuitty before the bar closed, began walking home, and stopped at a gas station to warm up, but he could not remember leaving the gas station or returning home.

2

Suiter's next memory was of waking up next to McQuitty and going to his neighbor's house for help. Suiter also made several inculpatory statements during the interview, stating that although he did not remember a fight, he must have been the one who killed McQuitty.

The State charged Suiter with first-degree murder. Three motions—one by Suiter and two by the State—are relevant to this appeal:

- Suiter moved to suppress post-*Miranda* statements, claiming they were not voluntary.

- The State sought to admit testimony of Suiter's prior physical abuse of McQuitty under K.S.A. 60-455—one incident when he had hit her in the face and one when he had attempted to strangle her.

- At trial, the State sought to prevent Suiter's expert—Dr. Mark Goodman, a clinical psychologist—from testifying about whether Suiter's intoxication prevented him from intentionally committing the crime.

The court denied Suiter's suppression motion and granted both requests by the State. It ruled that Suiter's post-*Miranda* statements were freely given and admissible; found the State's proposed prior abuse testimony admissible under K.S.A. 60-455; and allowed Suiter's expert to testify about the effects of alcohol on a person's cognitive ability but did not permit the expert to opine on whether Suiter intentionally killed McQuitty, finding such testimony would exceed the expert's demonstrated knowledge and invade the jury's role as fact-finder.

At trial, Sergeant Christian Cory, the former detective who *Mirandized* and interviewed Suiter, described the interview. And three police officers and a neighbor

testified about two prior incidents of abuse against McQuitty. Suiter's defense focused on how his intoxication impacted his ability to intentionally kill McQuitty, and his expert witness described the effects of alcohol and alcohol-induced blackouts. At the end of the presentation of evidence, the court instructed the jury on first-degree murder and on the lesser-included offenses of second-degree murder and voluntary manslaughter. The court also provided a voluntary intoxication instruction and gave a limiting instruction regarding the K.S.A. 60-455 evidence.

The jury found Suiter guilty of second-degree murder, and the court subsequently imposed a 226-month prison sentence. Suiter appeals.

DISCUSSION

Suiter raises four arguments on appeal, all of which involve evidentiary rulings by the district court. He argues the court erred in allowing inculpatory and involuntary post-*Miranda* interview statements to be admitted. He also argues the court improperly found prior instances of domestic abuse were admissible under K.S.A. 60-455. And he argues the court erred by limiting the scope of his expert's testimony. Finally, he argues that even if these errors individually do not require reversal, the combined effect of these rulings denied him a fair trial.

1. *Suiter's post-*Miranda *interview statements were voluntary and admissible.*

During his police interview, Suiter made several comments to Sergeant Cory indicating that he probably killed McQuitty. He asserts that the district court erred when it denied his motion to suppress evidence of those statements. Suiter argues several factors indicate his confession was involuntary: his drinking the night before, his distress and state of undress, and his inability to communicate with McQuitty's family. After considering the totality of the circumstances, we find his statements were voluntarily given.

4

The Fifth Amendment to the United States Constitution, made applicable to the states under the Fourteenth Amendment, protects an individual's right against self-incrimination. *State v. R.W.*, 58 Kan. App. 2d 135, Syl. ¶ 1, 464 P.3d 27, *rev. denied* 312 Kan. ___ (August 26, 2020). A coerced confession runs afoul of that right and is therefore inadmissible. *State v. Palacio*, 309 Kan. 1075, Syl. ¶ 4, 442 P.3d 466 (2019). "A confession is coerced—and inadmissible at trial—when a defendant's 'will was overborne.'" *R.W.*, 58 Kan. App. 2d at 144 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 667-78, 124 S. Ct. 2140, 158 L. Ed. 2d 938 [2004]).

Whether a confession is coerced turns primarily on its voluntariness—that is, "'whether the statement was the product of the free and independent will of the accused.'" *R.W.*, 58 Kan. App. 2d at 144 (quoting *State v. Groschang*, 272 Kan. 652, 662, 36 P.3d 231 [2001]). The State bears the burden of demonstrating by a preponderance of the evidence that a confession was voluntary. *State v. Gilliland*, 294 Kan. 519, Syl. ¶ 3, 276 P.3d 165 (2012). When making this determination, district courts rely on a nonexclusive list of factors, including:

> "(1) the accused's mental condition; (2) the duration and manner of the interrogation; (3) the ability of the accused on request to communicate with the outside world; (4) the accused's age, intellect, and background; (5) the fairness of the officers in conducting the interrogation; and (6) the accused's fluency with the English language." 294 Kan. 519, Syl. ¶ 3.

Courts' voluntariness analysis thus considers the totality of the circumstances under which a statement was given. 294 Kan. 519, Syl. ¶ 3. This analysis does not merely tally the factors; rather, the court must determine each factor's appropriate weight. One particularly weighty factor, whether independently or when combined with others, may support a finding that a statement was involuntarily given. 294 Kan. 519, Syl. ¶ 4.

5

Appellate courts apply a bifurcated standard when reviewing a district court's voluntariness determination. We review the underlying facts for substantial competent evidence but analyze the ultimate voluntariness determination de novo. *State v. Randolph*, 297 Kan. 320, 326-27, 301 P.3d 300 (2013). But we do not reweigh the evidence or resolve conflicting evidence. And our vantage point on appeal does not allow us to make credibility determinations. 297 Kan. at 327.

After reviewing a recording of the interview, summarizing relevant portions of the recording in some detail, and reviewing the voluntariness factors listed above, the district court found Suiter's statements were voluntary. It noted that although Suiter was distraught when first taken to the interview room, he was well-behaved and cooperative when the interview began. While there was a long initial wait, the actual interview was relatively short and conducted in a respectful manner. The court found that it was not unreasonable for the officers to deny Suiter's request to contact McQuitty's family, given the ongoing investigation. And it found Suiter conducted himself in an appropriate manner given his age, intellect, and background; the interview was fair and respectful; and Suiter spoke and understood English.

On appeal, Suiter contends that his mental state, the interrogation's duration, and his inability to communicate with the outside world rendered the statement involuntary. He argues that his mental state was not amenable to a voluntary statement: he had been drinking the night before, appeared to either retch or vomit multiple times into a trash can in the interrogation room, and was crying and wailing while waiting. As to the duration of the interview, he points out that he waited by himself for 3-1/2 hours in the interrogation room before the interview began, during which he only wore his underwear and was wrapped up in a blanket. And finally, he again points out that police did not allow him to speak to McQuitty's family.

Our review of the recording of the interview shows that the district court's factual findings are supported by substantial competent evidence. And based on the totality of the circumstances, the district court did not err in concluding Suiter's statements were voluntary. Although he had been drinking the night before, Suiter's interactions with police during the interview do not indicate that either alcohol or grief rendered him incapable of speaking or understanding others. While he was very distressed and retched multiple times while waiting, the duration of that initial wait appears to have allowed him to calm down and sleep off some of the effects of the alcohol. We observe that Suiter had calmed down significantly by the time he was interviewed. And though he was taken to the police station in his underwear (and provided a blanket), this condition did not appear to prevent him from engaging in conversation with Sergeant Cory or answering his questions.

Nor was the interview unduly long. Though he initially waited for 3-1/2 hours, given Suiter's initial distress, that time and the officers' actions to make him more comfortable allowed him to collect himself, improving his mental state. The following interview—a collective 75 minutes across three meetings interspersed by a collective 95 minutes of breaks—was not unduly lengthy. He behaved appropriately, and the interview was not conducted in a forceful or intimidating manner.

Finally, like the district court, we do not believe that the officers' refusal to allow Suiter to call his or McQuitty's family—and particularly McQuitty's mother—rendered his interview involuntary. We note that while Suiter mentioned his family at one point, the focus of his efforts was to contact McQuitty's, not his, family members. Our Kansas Supreme Court has recognized that while isolation from the outside world is one of the factors we consider in determining whether an interview was coerced, "it is to be expected that police will take steps to limit the ability of potential witnesses and suspects to communicate and, potentially, conspire during an investigation." *State v. Walker*, 283

7

Kan. 587, 598, 153 P.3d 1257 (2007). Suiter's interview and resulting statements were not made involuntary by the officers' refusal to allow him to speak to the victim's family.

The totality of the circumstances demonstrate that Suiter's post-*Miranda* statements were voluntarily made. The district court did not err when it denied Suiter's pretrial motion to suppress and allowed Sergeant Cory to testify about those statements at trial.

2. *The district court did not abuse its discretion when it found that the probative value of the State's K.S.A. 60-455 evidence outweighed its potential for undue prejudice.*

Suiter argues the district court erred by permitting evidence of two prior instances of physical abuse against McQuitty under K.S.A. 60-455. Notably, he does not challenge the district court's finding that this evidence was relevant to prove disputed material facts in the case. Rather, he challenges the district court's assessment of the accompanying prejudice, arguing the court erred when it found the probative value of the evidence did not outweigh its potential for undue prejudice.

K.S.A. 2019 Supp. 60-455(a) prohibits the introduction of a person's prior crimes or other bad acts as a basis for inferring that a person has a criminal disposition and, therefore, likely committed another crime. But under K.S.A. 2019 Supp. 60-455(b), prior crimes or other wrongs may be admissible to prove other material facts, such as a person's intent, or plan, or the absence of a mistake. *State v. McCune*, 299 Kan. 1216, Syl. ¶ 2, 330 P.3d 1107 (2014).

Courts engage in a multi-step analysis when determining whether evidence is admissible under K.S.A. 2019 Supp. 60-455(b). 299 Kan. 1216, Syl. ¶ 1. This includes three determinations:

- whether the evidence is material to prove a disputed fact—that is, whether the evidence goes to intent, absence of mistake, or another fact and has a real bearing on the case;

- whether the evidence is probative of the disputed material fact—that is, the evidence tends to prove the disputed fact; and

- whether the probative value outweighs the potential of creating undue hardship or prejudice.

*State v. Seacat*, 303 Kan. 622, 631, 366 P.3d 208 (2016); *State v. Hart*, 297 Kan. 494, 511, 301 P.3d 1279 (2013). If the evidence is admitted, the court must also instruct the jury on the limited basis for which the evidence may be considered. 297 Kan. at 511.

Though appellate courts review the first step in this analysis—materiality—de novo, we review the district court's assessment of the probative value of the evidence and its weighing that probity against undue hardship for an abuse of discretion. 297 Kan. at 511. A court abuses its discretion when its decision is based on a factual mistake, a legal mistake, or when no reasonable person would agree with the decision. *Seacat*, 303 Kan. at 634-35.

Before trial, the State filed a motion seeking a determination on the admissibility of evidence involving two prior instances of violence between Suiter and McQuitty. These included (1) an October 2015 incident when, after an argument, police found McQuitty with a swollen face and potentially a broken nose and Suiter with a stab wound in the chest, and (2) a November 2016 incident when, after a night of drinking, Suiter became angry and hit and choked McQuitty. After considering both parties' arguments, the district court found that the evidence was relevant to prove material facts of intent,

9

knowledge, motive, and opportunity. And the court found that the relevance of the evidence of these prior instances was not unduly prejudicial.

At trial, Sergeant Cory testified that during his interview, Suiter indicated that there were two prior instances when he had been violent with McQuitty, including one incident when Suiter had choked her. Later in the trial, the State called four witnesses—three Wichita Police officers and a neighbor—to testify about those previous instances when Suiter had physically abused McQuitty. The State also used the witnesses to admit photographs of the injuries.

Suiter only objected to Sergeant Cory's testimony based on the voluntariness of his statement; he did not object to the testimony regarding prior violent incidents between himself and the victim. He did object to the testimony of the other witnesses and the admission of the photographs. At the close of the trial, the court instructed the jury that the evidence of the prior altercations could be considered only for the limited purposes of assessing Suiter's intent and plan, as well as evidence of Suiter and McQuitty's discordant relationship.

On appeal, Suiter does not dispute the district court's ruling that the evidence of the earlier violent incidents was relevant to prove disputed material facts. Nor does he challenge the court's limiting instruction. Instead, he challenges the court's weighing of the evidence's probative value against its potential for prejudice. He argues the evidence's admission painted him as a serial abuser, resulting in the jury discounting his intoxication defense and providing it an incentive to convict him for these prior acts.

As a preliminary matter, the State argues that Suiter cannot challenge the introduction of this evidence on appeal because he failed to object to Sergeant Cory's initial testimony. It asserts that once this testimony was given, the evidence was before the jury—regardless of the other four witnesses' later testimony.

It is true that a party must timely object for a court to overturn a verdict based on the improper admission of evidence. See K.S.A. 60-404. And even when a court has taken up the admissibility of certain evidence in a pretrial motion, a party must generally object to the admission of that evidence at trial to preserve the issue for appellate review. *State v. Solis*, 305 Kan. 55, Syl. ¶ 1, 378 P.3d 532 (2016); see also *State v. Holman*, 295 Kan. 116, Syl. ¶ 1, 284 P.3d 251 (2012) (applying rule to K.S.A. 60-455 challenge), *overruled on other grounds by State v. Dunn*, 304 Kan. 773, 375 P.3d 332 (2016).

Though Suiter did not object to Sergeant Cory's summary of Suiter's previous violent acts, most of the evidence involving the incidents—including photographs of McQuitty's injuries—was introduced through the later testimony of the three other police officers and neighbor. We do not agree with the State that the introductory explanation provided by Sergeant Cory, even without an objection, opened the door to the detailed testimony these other witnesses provided, the sole point of which was to discuss the earlier altercations, or the photographs of McQuitty's previous injuries. Thus, we find that under these circumstances, the issue is properly before us.

We thus turn to whether the district court abused its discretion when it found that the probative value of this evidence outweighed its potential for undue prejudice. Courts have long recognized that this type of weighing is a matter we entrust to "the district court's sound judgment." *United States v. Abel*, 469 U.S. 45, 54, 105 S. Ct. 465, 83 L. Ed. 2d 450 (1984). This is "particularly true" when it comes to the "'on-the-spot balancing of probative value and prejudice, potentially to exclude as unduly prejudicial some evidence that already has been found to be factually relevant.'" *Sprint/United Management Co. v. Mendelsohn*, 552 U.S. 379, 384, 128 S. Ct. 1140, 170 L. Ed. 2d 1 (2008) (quoting 1 Childress & Davis, Federal Standards of Review § 4.02 [3d ed.1999]). Because this weighing does not require fact findings or legal determinations, we only reverse the

11

district court's assessment when no reasonable person would take the view it adopted. See *State v. Miller*, 308 Kan. 1119, 1138, 427 P.3d 907 (2018).

Our review of the record and the court's reasoning shows that the district court did not abuse its discretion when it found the relevance of this evidence outweighed its potential for undue prejudice. The November 2016 incident was certainly probative of the facts surrounding McQuitty's death; both incidents involved arguments that arose after Suiter had been drinking, and both ended with Suiter choking (or strangling) McQuitty. The October 2015 incident was perhaps less probative; it occurred more than two years earlier, no evidence indicates either Suiter or McQuitty had been drinking, and the method of harm was different. But it establishes a history of arguments escalating to violence, consistent with the State's theory as to the events that led to McQuitty's death. While the photographs of the injuries increased the prejudice, reasonable people could disagree about whether the evidence's probative value outweighed its potential for undue prejudice. Given this potential for disagreement, the district court did not abuse its discretion in admitting evidence of prior instances of abuse.

And even if we were to conclude that this evidence should not have been admitted, Suiter has not convinced us that it affected the outcome of his trial. Courts apply the statutory harmless error standard to the erroneous admission of K.S.A. 60-455 evidence. *State v. Torres*, 294 Kan. 135, 143-44, 273 P.3d 729 (2012). Suiter argues introduction of this evidence was not harmless because it was highly prejudicial and caused the jury to convict him based on this past conduct. We note, however, that Suiter did not object when Sergeant Cory testified that Suiter himself had brought up the previous incidents during his interview. More importantly for purposes of a harmless-error analysis, Suiter's primary defense at trial was that he could not have formed the requisite intent to kill McQuitty, and evidence presented at trial indicated that he did.

12

Suiter told Sergeant Cory during the interview that he likely was the person who killed McQuitty. And the form of death—strangulation—suggests that a killing was intentionally performed. See *Solis*, 305 Kan. at 67. The fact that the jury convicted Suiter of second-degree murder, a lesser-included offense, shows the jury did not merely convict him due to the prior instances of abuse but rather carefully considered the evidence. Under these circumstances, we find there is no reasonable probability that the admission of the State's K.S.A. 60-455 evidence affected the trial's outcome.

The district court did not err—and certainly did not commit reversible error—when it admitted evidence of the two prior violent arguments between Suiter and McQuitty.

3. *The court did not err when it ruled that Suiter's expert witness could not provide an opinion as to whether Suiter could form the intent to kill while intoxicated.*

Suiter argues the district court erred by restricting the testimony of his expert, Dr. Goodman. Suiter hired Goodman to determine if Suiter's intoxication prevented him from forming the requisite intent to kill McQuitty. In his report, Goodman opined Suiter likely could not form that intent; he based this conclusion on Suiter's statement that he could not remember what happened and on various videos and transcripts in which others stated Suiter would black out and lose his memory when drinking. At trial, Suiter intended to call Goodman to testify about several matters, including alcohol-induced blackouts generally and whether Suiter could have intentionally killed McQuitty during a blackout. The court allowed Goodman to testify about the former but ruled that any opinion on Suiter's ability to form the requisite intent would exceed the expert's ability to testify and invade the jury's fact-finding role.

As part of the fundamental right to a fair trial, a defendant is entitled to present a theory of defense. *Holman*, 295 Kan. 116, Syl. ¶ 5. A court violates that fundamental right by excluding relevant, admissible, and noncumulative evidence vital to that defense.

13

But that right is not unlimited; evidence must conform with statutory requirements. 295 Kan. 116, Syl. ¶ 5. An expert may offer an opinion if doing so would help the jury and the testimony is based on sufficient facts, reliable principles and methods, and the reliable application of those principles and methods to the facts of the case. K.S.A. 2019 Supp. 60-456(b). If those conditions are met, an expert opinion is not objectionable merely because it embraces an ultimate issue to be decided. K.S.A. 2019 Supp. 60-456(d).

Suiter frames this issue as a denial of his fundamental right to present a defense, which appellate courts review de novo. See *State v. Suiter*, 296 Kan. 137, Syl. ¶ 4, 290 P.3d 620 (2012). But this issue turns on whether the district court properly limited the extent of the expert's testimony given our rules of evidence—questions we review for an abuse of discretion. See *State v. Shadden*, 290 Kan. 803, Syl. ¶ 10, 235 P.3d 436 (2010).

As Suiter notes, Goodman's testimony is not objectionable merely because it embraces an ultimate issue. Unlike their federal counterpart, the Kansas Rules of Evidence do not prohibit testimony on whether a person possessed a specific mental state. Compare K.S.A. 2019 Supp. 60-456(d) with Fed. R. Evid. 703(b). If an expert's testimony meets the requirements of K.S.A. 2019 Supp. 60-456(b), that testimony is admissible up to the point where the opinion requires passing on the credibility of a witness or the weight of disputed evidence. *State v. Horton*, 300 Kan. 477, Syl. ¶ 3, 331 P.3d 752 (2014).

Goodman's testimony about Suiter's intent was inadmissible because Goodman omitted a critical step: establishing the relationship between alcohol-induced blackouts and the ability to form a specific degree of intent. At trial, Goodman discussed alcoholic blackouts, explaining that drinking excessive amounts of alcohol may result in memory loss. But there is no discussion, either in Goodman's report or his trial testimony, linking blackouts with the inability to form a certain mental state. In other words, it does not

14

necessarily follow that if intoxication interferes with a person's memory, then that person could not have acted intentionally while intoxicated.

Goodman could have opined that Suiter experienced an alcoholic blackout: Goodman explained the basis for alcoholic blackouts; Suiter had been drinking and could not remember what had happened; and others stated this occurred when he drank. But without making the connection between alcoholic blackouts and the ability to form intent, the next step—that because Suiter experienced a blackout, he could not have intentionally killed McQuitty or strangled her with the intent to kill her—lacks support.

Even had Goodman presented a link between alcohol-induced blackouts and the ability to form intent, the State notes that any hypothetical he could answer would be based on insufficient facts and thus could not have been helpful to the jury in determining whether Suiter could have intentionally killed McQuitty. Goodman had no information regarding how many alcoholic beverages Suiter had consumed, when he had consumed them in relation to the argument with McQuitty, and what effect this level of alcohol consumption would have had on his ability to form the intent to act. See *Staudinger v. Sooner Pipe & Supply Corp.*, 208 Kan. 100, 101-02, 104-07, 490 P.2d 619 (1971) (district court did not abuse its discretion when sustaining objections to hypotheticals posed to an expert to ascertain how intoxicated a driver had been during a car accident because hypotheticals concerning intoxication must include the person's age and weight, the amount of food eaten, the number and strength of drinks consumed, and the period over which these drinks were consumed).

The district court did not abuse its discretion when it prevented Goodman from testifying about whether Suiter could form the requisite intent to kill McQuitty.

15

4. *Suiter has not shown cumulative errors.*

Finally, Suiter argues that cumulative errors deprived him of a fair trial. Under a cumulative-error analysis, appellate courts determine whether, under the totality of the circumstances, the defendant was deprived of a fair trial. *State v. Harris*, 310 Kan. 1026, 1041, 453 P.3d 1172 (2019). To make that assessment, we consider all errors found in the context of the entire record. 310 Kan. at 1041.

A claim of cumulative error necessarily requires the existence of more than one error. *State v. Gonzalez*, 307 Kan. 575, 598, 412 P.3d 968 (2018). Here, we have found at most one possible error in the court's weighing of the K.S.A. 60-455 evidence and concluded that error did not affect the outcome of Suiter's trial. As such, Suiter's claim of cumulative error fails as a matter of law.

Affirmed.